IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 21, 2010 Session

## STATE OF TENNESSEE v. CALVIN EUGENE BRYANT, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1478     Steve R. Dozier, Judge**

**No. M2009-01718-CCA-R3-CD - Filed November 1, 2010**

The defendant, Calvin Eugene Bryant, Jr., was convicted by a Davidson County Criminal Court jury of two counts of sale of a Schedule I controlled substance in a Drug-Free School Zone and two counts of delivery of a Schedule I controlled substance in a Drug-Free School Zone, all Class A felonies. The delivery counts were merged with the sale counts, and the defendant was sentenced to concurrent terms of seventeen years in the Department of Correction. On appeal, he argues that the evidence was insufficient to sustain his convictions; the trial court erred in declaring one of the State's witnesses unavailable and allowing the witness's prior testimony to be read to the jury; the trial court erred in failing to instruct the jury on the lesser-included offense of facilitation; and the trial court erred in ordering that he serve 100% of his effective seventeen-year sentence. After review, we affirm the defendant's convictions but remand for entry of corrected judgments showing that 100% service only applies to fifteen years of the seventeen-year sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

James O. Martin, III (on appeal); Joy Kimbrough, Don Himmelberg, and John Higgins (at trial), Nashville, Tennessee, for the appellant, Calvin Eugene Bryant, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero and Rob McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

This case arises out of three controlled drug buys that took place on March 4, March 21, and April 23, 2008, between a confidential informant and the defendant. The defendant was indicted on three counts of sale of a Schedule I controlled substance (Counts 1, 2, and 4) and two counts of the alternate theory of delivery of a Schedule I controlled substance (Counts 3 and 5). Each of the five counts was alleged to have occurred within 1000 feet of a school in violation of Tennessee Code Annotated section 39-17-432, the "Drug-Free School Zone Act." The defendant was originally tried in October 2008, but the jury was unable to reach a verdict. The trial court declared a mistrial, and the case was transferred to a different trial court division. The retrial was scheduled for December 2008, and after a continuance, the case went to trial in February 2009.

## State's Proof

At trial, Detective William Loucks testified that he was a detective with the Specialized Investigations Division of the Metropolitan Nashville Police Department in the Gang Unit. He explained that the Specialized Investigations Division conducts "longer term" and "more indepth" investigations, often involving federal law enforcement agencies. In early 2008, Detective Loucks became involved in an investigation of the defendant in an area where "a high distribution of narcotics" had been taking place. Detective Loucks planned to use confidential informants to make purchases, and he described how he developed the informants.

Detective Loucks testified that in February 2008, he arrested Terrance Knowles on an habitual motor vehicle offender charge, and in the process, he talked to Knowles who "gave [him] some information that [he] felt was pretty accurate[.]" Detective Loucks gave Knowles his card and contact information and told him to contact him "if [he was] interested in working when [he] g[o]t out[.]" Knowles later contacted Detective Loucks, who met with him and another detective, and they discussed the rules and regulations for working as a confidential informant.

Detective Loucks testified that his next contact with Knowles was on March 4, 2008, when Knowles was to do a "reliability buy" of twenty pills for $140 – an amount he could purchase "that wouldn't throw up any flags." Around 11:00 a.m. that day, Detective Loucks met with Knowles at an address in the Edgehill community of Nashville and gave him $140 in previously photocopied money. Detective Loucks and other detectives followed and monitored Knowles as he went to a location in a housing complex in Edgehill. Detective Loucks was not able to visually watch Knowles enter and exit the house, but he was able to monitor the transaction via the audio device with which Knowles had been wired. Detective

-2-

Loucks identified a tape recording of the March 4 transaction and stated that he had since listened to it and recognized his voice as well as Knowles' and the defendant's.

Detective Loucks testified that after the transaction, he recovered the pills from Knowles and searched him. He turned the pills into the property room and submitted a request for forensic analysis by the Tennessee Bureau of Investigation ("TBI)." Detective Loucks identified "a bag of various colored pills" as the ones purchased by Knowles on March 4. He noted that Knowles was paid forty dollars, the standard rate for a reliability buy, and fifty dollars for providing intelligence on a suspected drug dealer.

Detective Loucks testified that the next transaction took place on March 21, 2008. This transaction was to be for 100 Ecstasy pills for $650. The transaction took place "[i]n the vicinity of 1305 12th Avenue South, Edgehill complex." He elaborated that it was "in the vicinity" because the defendant was not inside his residence but was standing outside. Detective Loucks described the same procedure as with the first transaction, whereby he met with Knowles, searched him and his vehicle, gave him previously photocopied money, and followed him to the intersection of 12th Avenue and Edgehill. As with the first transaction, Detective Loucks monitored and recorded the transaction on audio, while other detectives maintained visual surveillance.

Detective Loucks testified that he had since listened to the recording of the second transaction and on it recognized his voice as well as Knowles' and the defendant's. After the transaction, Detective Loucks recovered a bag of pills from Knowles, which he kept until the end of his shift when he field-tested the pills and turned them in to the property room with an analysis request form. Knowles was paid $100, the standard rate being a dollar per pill. Detective Loucks identified "a bag of various colored pills" as the ones purchased by Knowles on March 21.

Detective Loucks testified that a third transaction took place on April 23, 2008, around 10:00 p.m. Knowles told Detective Loucks that he had contacted the defendant and could purchase 200 pills for $1200. After going through the same procedures as before, Detective Loucks was able to personally observe this transaction through a pair of binoculars from a distance of 200 to 250 yards as well as listen to the audio. Detective Loucks testified that he had since listened to the recording of the third transaction and on it recognized his voice as well as Knowles' and the defendant's. After the transaction, Detective Loucks recovered "two bags of various colored pills" from Knowles and paid Knowles $200 at the standard rate of one dollar per pill. Detective Loucks transported the pills back to his office, where he conducted a field test and then turned them in to the property room along with an analysis request form.

Detective Loucks testified that in addition to the money paid for each of the drug buys, Knowles was paid an additional amount of $680 after the defendant was indicted and for items recovered pursuant to a search warrant. He was paid $100 for each of the defendant's five felony indictments, $100 for a gun recovered at the location of the defendant's arrest, and $80 for two controlled substances that were recovered. These were the standard rates for payment to informants.

Detective Loucks testified that he spoke with the district attorney about Knowles' habitual motor vehicle offender charge and "[i]t was dismissed upon [his] request," which was "[n]ot unusual." He also contacted Knowles' probation officer in July concerning a violation because he was trying to keep Knowles out of jail "to further along the investigation." He did not make any other promises to Knowles or give him any other assistance than what he had described. He said that "[n]othing is promised at all to the cooperating individuals, except . . . that I'm responsible for their safety." Detective Loucks stated that after Knowles' identity as the confidential informant was revealed at a previous hearing, he made one additional payment to Knowles on November 6 because "[h]e had stated . . . that he didn't feel safe in the current environment, so I paid him eight hundred dollars, again out of our intelligence fund, for relocation expenses."

Detective Loucks said that he did not arrest the defendant immediately after any of the three sales because they "were trying to broaden the investigation . . . [and] provide more bang for the buck for the taxpaying citizens." After the defendant was arrested, Detective Loucks asked him "about him selling pills" and the defendant said that "he sold anywhere between thirty to forty pills" in a week. The defendant did not respond when Detective Loucks asked him where he was getting the pills.

On cross-examination, Detective Loucks acknowledged that he did not record any of the conversations between Knowles and the defendant about setting up the transactions. He stated that the confidential informant contract states that "they are not to induce any individuals who are not predisposed to committing a crime." Detective Loucks acknowledged that the audiotape of the first transaction reflected that Knowles made several phone calls and no one answered. With regard to the second transaction, Detective Loucks agreed that the Ecstasy pills were delivered by a third individual, and Special Agent Mark Shafer observed the transaction, but he was not in a position to see it. Detective Loucks said that Knowles returned from the exchange with ten dollars more than he had been expecting.

Detective Loucks testified that the controlled substances that were recovered when the defendant was arrested did not come from the defendant's home but were found on the awning of the porch across from the defendant's home. Someone other than the defendant was seen throwing the package of substances onto the awning and running away. With

regard to his conversation with the defendant regarding how many pills he sold a week, Detective Loucks acknowledged that he did not record the statement or have the defendant submit anything in writing.

Detective Loucks testified that sometime after the first trial in this case, he appeared at Knowles' probation violation hearing, and Knowles was released "a period of time later" and given money to relocate. Knowles was apprised of the next court date, but Detective Loucks did not issue a subpoena because "[he] d[id] not have the power to issue a subpoena outside of an officer involved in an investigation." On continued cross-examination and redirect examination, Detective Loucks further testified about his knowledge of Knowles' whereabouts and his efforts to find him prior to trial. Detective Loucks stated that the defendant was "the leader of a set of Gangster Disciple gang members," and Knowles was "in fear for his life . . . because he received threats while he was incarcerated."

Terrance Knowles[1] testified that he was presently in custody on a probation violation. He went to court on the violation in August 2008 but left court after he was approached by defense counsel, who wanted to speak to him about the defendant's pending case. He was on a one-year probation term for the felony offense of "habitual driving offender." Knowles said that he went to jail and was charged with the driving offense in February 2008, at which time he had a discussion with Detective Loucks about "helping each other out, something like that. He told me what he was trying to do, what he was looking for. And I said I can do that." Detective Loucks told him that he was working on "[c]leaning up the Edgehill area," and the defendant's name came up during the conversation. Knowles knew the defendant by the nickname "Fridge." Knowles agreed to work with Detective Loucks and did so three times related to the defendant.

Knowles testified that the first time, he called the defendant "the day before" and told him that he wanted to buy twenty pills. The defendant gave him the price of $140 and said to call him the next morning. Knowles knew the defendant prior to this time, already had his phone number, and recognized his voice when he called him. The next day, Knowles met with the detectives, who "put a wire on [him]," and gave him instructions on making the transaction. Knowles went to the defendant's residence in Edgehill and attempted to reach him by knocking on the door and calling him, but he received no answer. While he was outside the residence, the defendant's sister arrived, and she discovered that the defendant was asleep.

---

[1]The testimony of Terrance Knowles from the first trial in this matter was read into the record by another witness as Knowles was not present and had been declared unavailable by the trial court pursuant to Rule 804 of the Tennessee Rules of Evidence.

Knowles testified that the defendant's sister let him inside the house, and he woke the defendant and told him that he needed the pills. The defendant asked him how many pills he wanted and retrieved them from one of the closets. There was no one else in the bedroom at the time. Knowles and the defendant then went downstairs, and the defendant asked Knowles if he had a bag. After Knowles responded that he did not, the defendant gave Knowles a sandwich bag and put the pills in it. Knowles paid the defendant $140 for the pills and asked him the price for 100 pills for the next time. The defendant told him that it would be "[p]robably six fifty or something like that." Knowles left and met with the detectives, turning over the pills. Knowles was paid "[a] hundred dollars, something like that."

Knowles described the second time he met with the defendant while working as a confidential informant. He called the defendant "and told him [he] needed a hundred pills this time." Knowles and the defendant agreed on a time for him to come by the defendant's house. Prior to going to the defendant's house, Knowles met with the detectives to have a wire put on him. When he arrived at the defendant's house, he had to wait twenty-five to thirty minutes "for the pills to get there." A white Expedition arrived, Knowles gave the defendant his money, and the defendant walked to the passenger side of the vehicle and returned with 100 pills. Knowles received some change back from the deal. Knowles then left and met with the detectives, turning over the pills. He was paid $100 to $150 for this transaction.

Knowles testified that the day of the third transaction, he called the defendant and "told him I wanted to get two hundred this time." The defendant told him that he was "going to work on it" and that it would cost $1200. Knowles called the defendant back, and the defendant told him "the dude was on his way. And, . . . I told him that I would be out there in a little bit." Knowles called the detective to "let him know he was on his way."

After meeting with the detectives, following the same procedure, Knowles went to meet the defendant by a basketball court near the defendant's house in Edgehill. Knowles waited "about an hour" until a Jeep Cherokee arrived, and the defendant said, "[T]hey're right here." Knowles counted the money and handed it to the defendant, who went and got the pills from the person in the vehicle. The defendant returned with two bags of different colored pills, which he gave to Knowles. After he received the pills, Knowles met with the detectives and turned over the pills.

Knowles testified that Detective Loucks helped him have a driving charge dismissed in March 2008. In addition to the money he received for each transaction, Knowles also received $700 after the defendant was arrested. He did not receive any other money or benefit, nor was he promised anything in exchange for his testimony. Knowles said that he

did not want to testify, and he was telling the truth about what happened on those three occasions.

On cross-examination, Knowles acknowledged that he discussed his testimony with the district attorney and Detective Loucks before the trial. He agreed that his felony habitual motor vehicle offender charge had been dismissed. After he was released from jail before the first transaction, Knowles called Detective Loucks and told him he wanted to help himself. Prior to the actual transactions, Knowles was not wired with any recording device when talking to the defendant. Knowles acknowledged that Detective Loucks told him that the target of the investigation was the defendant and to contact him when he had a deal arranged with the defendant.

Special Agent Mark Shafer with the Federal Bureau of Investigation, "FBI," testified that in the Spring of 2008, he was assigned to the Violent Crimes and Gangs Task Force and was involved in an investigation of the defendant. On March 21, 2008, Agent Shafer was working with Detective Mark Anderson of the Metropolitan Nashville Police Department in a surveillance van parked inside the Edgehill housing development. The surveillance "was all part of Detective Loucks' case." After they had been parked for some time, the confidential informant arrived, and Agent Shafer observed the informant converse with the defendant. A few minutes later, a white SUV arrived, and the defendant "walk[ed] over to the passenger side of that SUV. He had money in his hand. He handed money to the occupants of the SUV and, in turn, received a handful sized bag." The defendant then gave the bag to the confidential informant.

On cross-examination, Agent Shafer testified that he never met the confidential informant. He did not participate in locating Knowles in December 2008 or afterwards. He would have helped find Knowles if Detective Loucks had asked for his assistance.

Isaac Martinez, with the Metropolitan Nashville Police Department Property Room and Evidence Division, described the procedures for receiving evidence and transporting it to the TBI lab for analysis if requested. Martinez identified the bags of pills submitted by Detective Loucks and described how he transported them to the TBI lab for analysis in April 2008. He said that all of the bags were sealed when he left them with the TBI.

Martinez testified that one of the bags of pills was later taken to the TBI lab a second time, on October 8, 2008, by Sandra Luther who did not work in the property and evidence room. On redirect examination, Martinez noted that another bag of drugs was taken back to the TBI in October 2008 by Luther. He explained that it was not unusual for drugs to be resubmitted to the TBI for analysis, nor was it unusual for a detective to take an item to the TBI.

Agent Jennifer Sullivan, a forensic scientist with the TBI, testified as an expert in forensic chemistry that she analyzed the pills submitted as exhibits three and five in this case. Her analysis of the twenty pills in exhibit three revealed that each of the pills was a Schedule I drug, the majority were "34 methylenedioxymethamphetamine, or MDMA, commonly known as Ecstasy and methamphetamine" and some were benzylpiperazine and methamphetamine. Agent Sullivan's analysis of the 100 pills in exhibit five revealed that some were the Schedule I substance "34 MDMA and methamphetamine," and some were the Schedule II substance methamphetamine.

Agent John Scott, Jr., a forensic scientist with the TBI, testified as an expert in the field of forensic chemistry that he analyzed the pills submitted as exhibit seven in this case. His analysis of the 200 pills that were submitted revealed that fifty-four of the pills did not contain any controlled substance, seventy-one of the pills contained the Schedule II controlled substance methamphetamine, and seventy-five of the pills contained the Schedule I controlled substance MDMA and methamphetamine.

Mary Beth Stephens, a GIS analyst for the Metro Planning Department, testified that in October 2008, she went with Detective Loucks, the district attorney, and defense counsel to the "corner of Edgehill and 12th" for the purpose of mapping the locations of the drug transactions in the defendant's case. Stephens took with her a map of the area created from aerial photographs and property line data stored in the Planning Department's database. From 12th and Edgehill, Detective Loucks directed Stephens to three separate locations. She made notations on her map of the locations and used her data to create a larger map that noted the locations of the incidents and the locations of schools within the 1000 feet "buffer zones" around the schools in the area.

Stephens identified incident number one as occurring at 1305 12th Avenue South, which was within 1000 feet of two schools, Carter Lawrence Elementary and the Murrell Special Education School. Incident number two occurred at the edge of the pavement immediately across from the housing development, and incident number three occurred at the edge of the sidewalk that led to the playground for the school. Both incidents two and three occurred within 1000 feet of the same two schools as incident one. On cross-examination, Stephens acknowledged that the incident locations noted on her map were based on locations described to her by Detective Loucks.

**Defendant's Proof**

Walter Fisher testified that he was an in-school suspension instructor at Hillsboro High School and had known the defendant for eight of the ten years he had been teaching. Fisher recalled that during the four years the defendant attended Hillsboro, the defendant

never had any type of violation or was sent to in-school suspension for any reason. Fisher described the defendant's character as "impeccable," and he said that the defendant was a "model citizen" and loving toward his family. Fisher recalled the defendant's athletic ability and success on the football team, and he described that the defendant had "always been a leader on those teams[.]" He recalled that the defendant's former head football coach, Ron Aydelott, Councilman Ronnie Greer, and the defendant's minister had testified on the defendant's behalf at an earlier hearing.

Fisher testified that he had never known the defendant to use drugs or heard any rumors of the defendant being involved with selling drugs. Fisher knew that the defendant enrolled in college at Tennessee State University instead of going elsewhere because his father had triple bypass surgery and the defendant did not want to leave him. Fisher was aware of a fight the defendant was involved in during high school. To his understanding, another student was continuously provoking the defendant on the school bus. After they got off the bus, the defendant tried to walk away but hit the other student after continued provocation. The defendant only hit the other student once and then walked away. Fisher said that aside from that one fight, the defendant "was a peacemaker at school."

On cross-examination, Fisher clarified that he had coached basketball and had not been one of the defendant's football coaches. Since the defendant's graduation from high school in 2004, Fisher had seen the defendant once every two months but saw him every day during his attendance at Hillsboro. From his observations of the defendant during his school years, Fisher believed the defendant to be a good student, an intelligent person, and a good problem solver. Fisher never saw a situation where the defendant was intimidated during football games.

Fisher testified that he thought it was "[u]nbelieveable" when he heard the defendant had been arrested for selling drugs. It would surprise him if he heard the defendant on audiotape participating in a drug transaction. Fisher had never known the defendant to carry a weapon, and it would surprise him to learn that the defendant had a prior arrest for carrying a weapon. He acknowledged that there were some things about the defendant that he did not know about. Fisher thought that the defendant being described as a confirmed leader of the Gangster Disciples was "unbelievable." Nevertheless, Fisher said that none of these revelations changed his opinion of the defendant. He agreed that his impressions of the defendant were from his four years of high school, which ended in 2004. On redirect examination, Fisher agreed that the defendant was the type of person who would do anything for a friend.

Suzanne Frensley testified that she was a teacher at Hillsboro High School and was selected as the 2007 Teacher of the Year for the State of Tennessee. Frensley had known the

defendant for seven years, beginning when his mother was the caregiver for her godmother. She said that the defendant was "very generous" with her godmother and spent time watching basketball and hockey games with her. She maintained contact with the defendant after she began teaching at Hillsboro. Frensley described the defendant as "[l]arge and strong with a soft inside and a big heart." She said that he was very close to his parents and sister. She noted that he "took a great interest in the people who live in his neighborhood" and was "supportive of the community." Frensley had come to court three times to testify on the defendant's behalf and would never hesitate to do so.

On cross-examination, Frensley clarified that the defendant was never in one of her classes but described herself as his mentor and role model. Frensley noted that she taught leadership at Hillsboro and was not sure that she would have identified the defendant as a leader. She thought that "his leadership is more on a relationship level, caring about people, his family and friends." She noted that people looked up to him, but "he never stood out and said, I'm the leader, I'm the big man."

Frensley stated that she was not aware of the defendant's reputation for carrying a weapon or heard information of him being a confirmed leader of the Gangster Disciples in Edgehill. Frensley was aware of the allegations in this case and that the transactions were recorded on audiotape, but her knowledge of those incidents, although surprising to her, did not change her opinion of the defendant. Frensley acknowledged that she did not know everything that was going on in the defendant's life.

The defendant testified that he had resided with his mother in the Edgehill housing projects his entire life and attended Hillsboro High School where he was captain of the championship football team. He identified several newspaper articles chronicling his football career and described the interest he received from many colleges due to his athletic ability. Once he graduated from high school, the defendant enrolled at Tennessee State University and, while in school, worked first for The Tennessean newspaper and then Coca-Cola. He also applied for a job with the United States Post Office, and he had been scheduled to interview in June 2008. The defendant admitted that, at one point in college, his grades dropped and he was placed on academic probation. However, he received a letter saying that he was welcome to come back to school.

The defendant testified that he knew Detective Loucks prior to his arrest "[f]rom around the neighborhood." He said that Detective Loucks had stopped him on more than one occasion and searched him for weapons or drugs but had never found anything. On these occasions, the detective never said that the defendant had done anything wrong, "but they always come around the neighborhood and say they received calls[.]"

The defendant said that he knew Knowles from "growing up in the neighborhood," even though Knowles was seven or eight years older. He and Knowles "had a personal relationship," and Knowles had "been around the family for quite a while." The defendant acknowledged that Knowles purchased drugs from him. He explained that before the first transaction, Knowles approached him near the basketball court and asked if he "kn[e]w anybody with some pills" because he had someone wanting to buy some from him. The defendant told Knowles that he did not and that he did not "want to get involved with it." However, Knowles kept telling the defendant that he needed to get the money to feed his family and "called [him] several times . . . on a day to day basis, . . . [s]o, eventually, [he] gave in and helped him[.]"

The defendant testified that the day before the first transaction, Knowles called and asked if he could purchase thirty extra pills. The defendant told Knowles that he could get them, and Knowles was supposed to come by that night. "[T]he guy" brought the pills to the defendant, but Knowles did not show up that night. The next day, the defendant was in bed asleep when his sister and Knowles came and woke him up. Knowles asked for only twenty Ecstasy pills, and the defendant gave them to him. Knowles then asked the price for 100 pills, and the defendant "gave him a price on it," which was $650. The defendant explained that he knew the price "[b]ecause in the kind of environment [he] grew up in, you'll know the prices for things."

The defendant admitted that there was a second transaction in which he sold 100 Ecstasy pills to Knowles for $650. However, the defendant did not have the pills in his possession – "[someone] brought them to [him] and [he] gave them to Terrance Knowles." The defendant admitted that after either the second or third transaction, he told Knowles to count the pills. The defendant said that the man who brought the drugs to him was someone he did not know well but "kn[e]w him well enough." The defendant noted that Knowles had called him various times between the first and second transactions and those calls were not on the audiotapes.

The defendant testified that Knowles also called him after the second transaction. The defendant explained that "[i]n between these deals, I kind of, like, was, still, I didn't want to do it[,]" but Knowles kept talking about his family and how he had helped raise him. He tried to put Knowles off by saying that he would see what he could do, but then Knowles would "eventually pop up on the scene . . . [a]nd that's when [he would] just go ahead and call the individual." The defendant said that he never told Knowles on the phone to come over. After the third transaction, the defendant refused to help Knowles "[b]ecause [he] came to a conclusion that [he] didn't want to participate in it anymore."

The defendant acknowledged that he had twice been arrested for weapons possession.

After his first arrest, the defendant obtained his handgun carry permit, which required that he be fingerprinted and not have any felonies on his record. With regard to the school bus assault incident when he was fifteen or sixteen, the defendant explained that the other boy kept picking on him, and they "passed words." As he was getting off the bus, the other boy came at him, so he hit him. The defendant said that he and that boy were now close friends. The defendant denied being the leader of the Gangster Disciples but acknowledged that he had been around gang members.

The defendant testified that prior to the first incident with Knowles, he had never sold drugs to anyone. The defendant explained that when he was arrested in this case, the police searched him and his house and did not find any drugs. However, on a nearby roof, the police found drugs that they believed to be his, which resulted in his being charged.

On cross-examination, the defendant acknowledged that when he was arrested, he never told the police he was just doing a favor for a friend. Prior to receiving his handgun permit, the defendant was convicted of unlawful possession of a weapon and placed on probation. His permit was revoked before his second arrest for unlawful possession, but he said he did not know it had been revoked or he would not have carried a weapon. As to the fight he was involved in as a juvenile, he said that he was charged for an aggravated assault but believed it was amended to simple assault because he did not have a felony on his record.

The defendant acknowledged that during the first transaction, Knowles asked the price for 100 pills and the defendant told him immediately $650. He further acknowledged that the recordings did not reflect his ever telling Knowles that he did not want to sell the drugs. The defendant admitted that the recording from the second transaction reflected him describing the different names for the various colored Ecstasy pills and specifically that Knowles needed to be careful with the "brown bulls" because "[p]eople could pass out on them[.]" The defendant explained that he "was telling [Knowles] what the guy told [him]." The defendant acknowledged that the recording of the third transaction reflects him telling Knowles to count the pills even though the man who delivered them was "usually good."

After the conclusion of the proof, the jury found the defendant not guilty of count 1, the March 4 sale, and guilty of the remaining four counts.

## ANALYSIS

### I. Sufficiency of the Evidence

-12-

The defendant challenges the sufficiency of the convicting evidence on two bases: the State failed to prove that the buildings it alleged to be schools were actually schools, and the proof at trial established the defense of entrapment.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. School Zone

The defendant was convicted under alternate theories of selling and delivering a Schedule I controlled substance. See Tenn. Code Ann. § 39-17-417(a), (b) (2006). Although the offenses were Class B felonies, id. § 39-17-417(b), he was charged and found guilty under the Drug-Free School Zone Act, which raised the conviction class to a Class A felony. See id. § 39-17-432(b)(1). The Act defines this enhanced drug offense as "[a] violation of § 39-17-417 . . . that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center

-13-

or park[.]" Id. As required, the indictment specifically alleged that the sales occurred within 1000 feet of the type of school prohibited in the statute. See State v. Fields, 40 S.W.3d 435, 440 (Tenn. 2001).

In this case, as proof that the sales occurred in a drug-free school zone, the State presented the testimony of Mary Beth Stephens, an employee of the Metro Planning Department, who went to the locations of the drug sales guided by Detective Loucks and accompanied by the district attorney and defense counsel. Stephens created a map of the area of the sales using aerial photographs and property line data from the Planning Department's database. Stephens testified that the locations were within 1000 feet of two schools shown on the map – Carter Lawrence Elementary and Murrell Special Education School.

The defendant contends that the State's proof was insufficient because it did not demonstrate that those buildings actually functioned as schools or were in existence at the time of the offenses. He points to cases where additional proof came by way of the school principal or other school official. See State v. Jermaine Rashad Carpenter, No. E2007-02498-CCA-R3-CD, 2009 WL 331330 (Tenn. Crim. App. Feb. 11, 2009), perm. to appeal denied (Tenn. Aug. 17, 2009); State v. Charles Lincoln Faulkner, No. E2006-02094-CCA-R3-CD, 2008 WL 2242531 (Tenn. Crim. App. June 2, 2008); State v. Antonio Rico Walls, aka Rico, No. M1998-00358-CCA-R3-CD, 2002 WL 1343234 (Tenn. Crim. App. June 20, 2002), perm. to appeal denied (Tenn. Nov. 12, 2002); State v. James David Lamor Perry, No. E1999-00271-CCA-R3-CD, 2000 WL 1246577 (Tenn. Crim. App. Sept. 5, 2000), perm. to appeal denied (Tenn. Mar. 12, 2001). The defendant further points to Fields, 40 S.W.3d at 440, where the Tennessee Supreme Court, in a discussion regarding alternative sentencing, noted as dicta that there was "no evidence in the record that the George Clem school was an elementary, middle, or secondary school as required by the Act" to assert that more proof was required than that offered by the State.

While this court has affirmed school-zone convictions where the proof included testimony from an employee of the school about its operation, our courts have never held that doing so was required. For example, in State v. Roberto Vasques, Luis D. Vidales Romero, Kevin Joel Hernandez, Luis Martin Vasquez, Hector Alonzo, and Victor Hugo Garza, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530 (Tenn. Crim. App. Oct. 7, 2005), perm. to appeal granted (Tenn. Feb. 27, 2006), aff'd State v. Vasques, 221 S.W.3d 514 (Tenn. 2007), the summarized proof regarding school zones was the testimony of a detective who said that he measured the distances of certain incident locations to nearby schools and gave the measurements. Id. at *6. Although the panel had already affirmed the trial court's grant of coram nobis relief as to two of the defendants because of newly discovered evidence regarding one officer's drug addiction, it nevertheless addressed the sufficiency of the convicting evidence and found it sufficient as to all of the defendants' arguments. Id. at *14-

-14-

On review by our supreme court, the court likewise concluded that the evidence was sufficient to establish that the offense occurred within 1000 feet of a school. Vasques, 221 S.W.3d at 523.

As another example, in State v. Lindsey, 208 S.W.3d 432 (Tenn. Crim. App. 2006), "the GIS Manager for the City of Kingsport[,] responsible for the city's computer mapping needs[, testified that] [b]ased on the aerial photograph of the location of the drug buy[,] . . . that the intersection of Boone Street and East Wynola Avenue was approximately 480 feet from the New Horizon Alternative School." Id. at 437. Although the identity of the perpetrator was the issue in the case, this court's review of the sufficiency of the evidence included the GIS Manager's testimony as establishing the fact that the transaction occurred in a school zone. Id. at 444. See also State v. Greg Harris, No. E2003-02834-CCA-R3-CD, 2005 WL 419082, at *3, 8-9 (Tenn. Crim. App. Feb. 23, 2005) (whether offense occurred in school zone not issue on appeal, but court concluded that evidence was sufficient to support conviction of possession of cocaine in a school zone where a Geographic Systems Manager for the city testified that he prepared a map of the area of the defendant's arrest and it was 550 feet from Dobyns-Bennett High School).

Moreover, contrary to the defendant's urging, we do not view Fields, 40 S.W.3d 435, as instructive on the issue presented in this case. In Fields, the defendant was not indicted for a violation of the Drug-Free School Zone Act. Id. at 440. In fact, the defendant's conviction for facilitation of the sale of cocaine did not fall under the purview of the Act. Id. at 439-40; see Tenn. Code Ann. § 39-17-432(b). However, the trial court used the fact that the drug offense occurred near "George Clem" school to deny alternative sentencing. Fields, 40 S.W.3d at 438. The supreme court held that testimony that the offense occurred within the statutory distance of "George Clem" school was insufficient to overcome the presumption of alternative sentencing. Id. at 437. The court noted that "there is no evidence in this record that the George Clem school was an elementary, middle, or secondary school as required by the Act." Id. at 440. The court also noted that "the record [does not] indicate whether . . . the school was open, whether it was visible from the location of the drug transaction, or whether children were within the vicinity." Id. at 437. However, the court used these factors only to address the sentencing issue – whether the evidence supported the use of the "seriousness of the offense" to sentence the defendant to confinement. Id. at 441. Our research has revealed no instance of such factors being a prerequisite for liability under the Act. In fact, this court has explicitly held that whether the offense occurred during normal school hours was irrelevant in determining whether a drug transaction occurred in a school zone under the Act. State v. Smith, 48 S.W.3d 159, 169 (Tenn. Crim. App. 2000).

Although not binding on this court, under the federal counterpart of our Act, it has been held that "the Congress intended to subject drug dealers to enhanced punishment only

-15-

for conduct occurring within 1,000 feet of an *operating* school[,]" not merely a school building that is no longer or not yet in use as a school. United States v. Hawkins, 104 F.3d 437, 440-441 (D.C. Cir. 1997), cert. denied, 522 U.S. 844 (1997) (emphasis added). However, the courts have held that the name of the school was sufficient evidence for a rational jury to conclude that the school was an operating school. See id. at 441; see also United States v. Singletary, 69 Fed. Appx. 468, 468-69 (D.C. Cir. 2003); United States v. Holland, 59 F. Supp. 2d 492, 519 (D. Md. 1998).

In sum, neither the plain language of our Act nor our case law requires the proof urged by the defendant. Here, Stephens created the map using official databases and aerial photographs less than a year after the offenses took place. She testified that the offenses took place within 1000 feet of Carter Lawrence Elementary School and Murrell Special Education School. On the map, one can see numerous vehicles in the parking lot of Carter Lawrence Elementary School. The jury was allowed to use common sense in evaluating the information and Stephens' testimony and determining whether the buildings identified as an elementary school and a special education school were in fact schools. Moreover, even if we were to adopt the federal interpretation, the evidence would still be sufficient to support the defendant's convictions because the schools were identified by name.

### B. Entrapment

The defendant argues that the evidence was insufficient for the jury to find him guilty because the proof established the defense of entrapment. The defense of entrapment is codified at Tennessee Code Annotated section 39-11-505, which provides: "It is a defense to prosecution that law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so." Tennessee applies the subjective test for determining whether a defendant has been entrapped into committing a crime, which "requires the fact finder to focus on the subjective intent of the defendant to determine whether the defendant was predisposed to commit the criminal act, with law enforcement officials furnishing only the opportunity, or whether the defendant was an innocent person induced by police into committing the criminal offense." State v. Shuck, 953 S.W.2d 662, 666 (Tenn. 1997) (citations omitted). Relevant factors to consider when determining whether a defendant was predisposed to commit a crime

> include the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by law enforcement officials; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense which was overcome only by repeated inducement or

persuasion by law enforcement officials or agents; the nature of inducement or persuasion engaged in by law enforcement officials; and any other direct or circumstantial evidence that the accused was ready and willing to engage in the illegal conduct in question. In determining predisposition a court or jury should consider the totality of the circumstances.

Id. at 670 (citations omitted). The trial court determines the threshold question of whether the defense of entrapment has been "fairly raised" by the proof, and "if entrapment is, in fact, 'fairly raised by the proof,' the issue of predisposition becomes a question of fact for the jury." State v. Blackmon, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001) (citations omitted).

The defendant argues that there was ample evidence proving that he was entrapped into committing the offenses. He asserts that none of the conversations between him and Knowles leading up to the transactions were recorded, and those conversations would have shown that Knowles constantly pressured and guilted him into obtaining drugs. He also argues that he never had pills at his immediate disposal, and he did not profit from the transactions. He points to his acquittal in the first count to assert that the jury found that he had been entrapped into committing the first transaction. However, that is but one possible basis for his acquittal as the jury returned a general verdict of not guilty.

In the light most favorable to the State, the evidence shows that the defendant agreed to obtain large quantities of Ecstasy for Knowles on two occasions, he was knowledgeable about the prices and details of the product, and he knew how and where to quickly obtain pills in the quantity to sell Knowles. The audiotapes of the transactions illustrated no hesitation in participating on the defendant's part. Furthermore, there was testimony at trial that the defendant told Detective Loucks that "he sold anywhere between thirty to forty pills" in a week, and the defendant told Knowles to count the pills even though the man who delivered them was "usually good." Although the defendant explained that the basis for his knowledge of the cost of the drugs was due to the environment in which he lived, the jury obviously discredited this explanation. The jury also obviously discredited the defendant's testimony that he did not want to sell the drugs and only did so because of Knowles' claim of hardship. This was the jury's prerogative. Taken in the light most favorable to the State, the evidence was sufficient for the jury to reject the defendant's defense of entrapment.

## II. Unavailable Witness

The defendant argues that the trial court erred in declaring the State's witness, Terrance Knowles, unavailable and allowing his prior testimony to be read to the jury.

On December 3, 2008, the State filed a motion to have Knowles declared unavailable

to testify at trial. The defendant filed a response on February 17, 2009, and the court heard proof on the matter that same day. At the hearing, Mickie Daughtery testified that she was an attorney in the Metropolitan Public Defender's Office and had represented Terrance Knowles. Daughtery said that she was present for portions of the defendant's first trial in October 2008, which ended in a hung jury. Afterwards, she discussed with Knowles "the importance of his continued cooperation with the State, that when he was placed in a protective situation, because of the threats that he was receiving, that it would be imperative that he be available to testify in the trial, whenever it was rescheduled." Knowles assured her "[t]hat he would be here."

On cross-examination, Daughtery recalled that Knowles was in protective custody at the Criminal Justice Center during the first trial. At Knowles' probation violation hearing about two weeks later, Daughtery, the assistant district attorney, and Detective Loucks reached an agreement to have the probation violation retired and probation reinstated. However, the next day, Daughtery discovered that Knowles' probation had actually expired, and she contacted his probation officer, "who . . . had also figured out the same thing . . . so there was no longer any supervision." Daughtery stated that it was discussed at the probation violation hearing that Knowles "was going to be moved for his safety . . . to protect him from retaliation by the defendant's people . . . not to keep him available to the State[.]" Daughtery was aware that Knowles was going to be given "some amount of money to try to help him set up an apartment or something to relocate to a safe area outside of Davidson County," but she said that was not something that she was involved with.

Daughtery testified that the next time she heard from the district attorney's office regarding Knowles was within the past two weeks, "inquiring if [she] had had any contact," and she looked through her files for possible contact information. Daughtery also recalled that she ran into Detective Loucks "around Christmas time" and was informed that Knowles "was on the run or something of that nature." When Daughtery was looking for Knowles' contact information, she discovered that Knowles had a new case that was "bound . . . over on an information agreement" that was assigned to another attorney in the public defender's office. However, Knowles "apparently . . . made bond on that, because he's not in custody."

Detective Loucks with the Metropolitan Nashville Police Department testified that he was the lead detective assigned to this case. After the mistrial, Detective Loucks and the district attorney met with Knowles and his attorney, and Knowles was informed of the date for the retrial and that he had to be present even if he did not receive a subpoena. Detective Loucks recalled that his next and last contact with Knowles was on November 5, when he paid Knowles the relocation money. At that meeting, he told Knowles "that [they] weren't to be [in] contact any more until the actual trial [and] [r]eminded him . . . of the upcoming trial and told him the only reason we needed to be in contact was if he received any threats

about his testimony previously."

Detective Loucks testified that he attempted to locate Knowles on February 11, 13, and 16 by going to a number of previous addresses he had for Knowles and calling his contact numbers, but he was not successful in locating him. On the morning of February 17, Detective Loucks made another attempt to find Knowles by visiting his second most recent previous address, but no one answered the door.

On cross-examination, Detective Loucks acknowledged that he had trouble locating Knowles before the first trial, and he had to have the U.S. Marshals assist in finding him. The U.S. Marshals located Knowles at 930 33rd Avenue North, which was one of the addresses Detective Loucks checked in trying to find Knowles for the retrial. Even though Knowles had an active utility account at that location and it was "supposed to have been his mother's address," no one answered the door either time Detective Loucks stopped by. Detective Loucks stated that when Knowles was preparing to relocate, he told Knowles that he did not "need to know the location for safety" and that "the next time [they] needed to have contact was either at Court or if he had started receiving threats."

Detective Loucks acknowledged that Knowles had a lengthy criminal history, but he was not aware until reviewing the record at the hearing that Knowles had at least fourteen failures to appear over a ten-year period. Detective Loucks acknowledged that Knowles was arrested on July 21, 2008, on a probation violation, and he contacted his probation officer about setting a bond. Detective Loucks also acknowledged that Knowles received a failure to appear on August 13, 2008, because "he went to court and left," and Detective Loucks had spoken to him about it. He admitted that Knowles had "missed court before."

Detective Loucks stated that he gave Knowles $800 to relocate. He acknowledged that he told Knowles he did not need to know where he was but explained that was "because [they were] not supposed to be talking." Detective Loucks said that he "didn't find . . . out until last week" that Knowles had been rearrested and released from jail in December and again in January or February. Detective Loucks stated that he could not have tried to hold Knowles for trial because he was not even aware of Knowles' arrest. The first day he started looking for Knowles was February 11, 2009, less than a week before trial. He stated that he was not aware that Knowles was out on bond for a court date in June and had not spoken with the bonding company.

On redirect examination, Detective Loucks elaborated that the reason Knowles said that he left court on the August 2008 court date was because he became afraid when defense counsel approached him and asked if and why he was going to testify. At that point, Detective Loucks had not yet revealed the confidential informant's identity. Detective

Loucks stated that the August 2008 instance was the only failure to appear on Knowles' record since he had begun working with him in February 2008. Detective Loucks did not pay Knowles to be unavailable for trial, and Knowles was aware of the December court date when he received the relocation money.

As part of her recross-examination, defense counsel clarified the answer given by Knowles at the first trial as to why he left court on August 13, 2008. Counsel read from the transcript where Knowles testified that defense counsel had approached him and introduced herself as the defendant's attorney. Knowles said that he asked her how she knew him, and she said that she wanted to talk to him about the defendant's case. Knowles told her that he did not know anything about the defendant's case. Knowles' testimony continued that defense counsel gave him her card; whereupon, he returned to the courtroom, waited for an hour, spoke to his attorney, and then left.

Assistant District Attorney Rachel Sobrero identified a letter she wrote to defense counsel dated October 3, 2008, in which she said that Knowles would not receive further compensation for his testimony. She elaborated that, "[B]y compensation, I mean he wasn't paid for his testimony. . . . He was to relocate because of threats to him and because he was in danger."

On cross-examination, General Sobrero explained that Knowles was compensated for working as a confidential informant, but "[t]here were no deals to give him any more money based on whether or not he testified in the case." Subsequent to Knowles' testimony at the original trial, Knowles' safety became a concern because he had been publicly revealed as an informant. In addition, Knowles relayed to her that he was feeling threatened.

In granting the State's motion to declare Knowles unavailable, the trial court stated:

There has been a good faith effort to find him. He is not unlike a lot of people that have a lot of failure to appears around here. Does that mean the State purposefully made him and was part of some scheme to make him unavailable? The Court doesn't find that. I mean, that's [the] argument that has been made. But it's not like Mr. Knowles testified at some ten minute preliminary hearing, which could even be available as former testimony under 804. He testified at a full Jury trial and was cross examined about anything and everything that was to be asked.

The trial court also addressed the issue at the hearing on the motion for new trial as follows:

We heard about, prior to trial, from Detective Loucks about the efforts to find him. Did they get the Federal people to try to find him? No. Had they gone to his house, checked NES, gone, talked to his mom? Yes. All that information about eight hundred dollars to relocate, all that's in the record. The defendant's posture was the State had purposefully made him unavailable. That, in the Court's opinion, was not accurate. In an attempt to continue to locate that person, the Court issued a warrant, had the officer calling to the CI's mom, going by locations. He could not be located. So he was unavailable, in the Court's opinion.

The Sixth Amendment of the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides the corresponding right "to meet witnesses face to face." Tenn. Const. art. I, § 9. In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 68 (2004). The defendant does not challenge the admissibility of Knowles' former testimony under the second prong of the test, as Knowles was subject to cross-examination during the first trial. Instead, the defendant contests that the State made a sufficient showing of unavailability.

Under Tennessee Rule of Evidence 804, a witness may be declared unavailable in situations where he or she persists in refusing to testify despite an order of the court to do so; demonstrates a lack of memory; is unable to be present or to testify at the hearing because of death or physical or mental illness or infirmity; or is absent from the hearing and the proponent of the witness's statement has been unable to procure the witness's attendance by process. Tenn. R. Evid. 804(a)(2)-(5). When a witness is declared unavailable, his or her testimony given at another hearing or at a deposition is admissible as an exception to the rule against hearsay. Tenn. R. Evid. 804(b). In State v. Henderson, 554 S.W.2d 117 (Tenn. 1977), the Tennessee Supreme Court stated that a witness cannot be deemed "unavailable" unless the State made a "good faith" effort to secure the witness's presence. Id. at 119-20. The United States Supreme Court has stated that "good faith" is defined as "[t]he lengths to which the prosecution must go to produce a witness . . . [and] is a question of reasonableness." Ohio v. Roberts, 448 U.S. 56, 74 (1980), overruled on other grounds by Crawford, 541 U.S. 36. This court reviews a trial court's ruling on the unavailability of a witness under an abuse of discretion standard. State v. Summers, 159 S.W.3d 586, 596 (Tenn. Crim. App. 2004); Hicks v. State, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

As thoroughly detailed above, after the conclusion of the first trial, Knowles' attorney stressed to Knowles the importance of his cooperation with the State and that he be available to testify at the rescheduled trial. Knowles assured her that he would. The district attorney contacted Knowles' attorney within the two weeks prior to the trial inquiring into Knowles' whereabouts. Detective Loucks was in contact with Knowles in November 2008, before the original retrial date in December 2008. Detective Loucks reminded Knowles of the upcoming trial date and of his importance of attending even if he did not receive a subpoena. Detective Loucks ultimately did not attempt to locate Knowles before the December 2008 trial setting because the date was cancelled. However, several times in the week prior to the February 2009 trial setting, Detective Loucks visited a number of the previous addresses he had for Knowles and made numerous phone calls in an attempt to locate him. At one of the addresses, Knowles had an active utility account and it was supposed to be his mother's address, however, no one answered the door. It was based on these actions that the trial court found that the State had made a good faith effort to find Knowles.

The actions taken and the proof presented in this case are in contrast to the minimal actions taken in State v. Armes, 607 S.W.2d 234 (Tenn. 1980) and State v. Charles Sharp, No. W2008-01656-CCA-R3-CD, 2010 WL 623589 (Tenn. Crim. App. Feb. 22, 2010). In Armes, the court observed that "the prosecutor's *de minimis* effort of issuing a subpoena for [the witness] the day before the trial can only be seen as less than a good faith effort." Armes, 607 S.W.2d at 237. The court further observed that the prosecutor's representations to the court "concerning the efforts of the State's investigator to locate the witness cannot be considered as evidence of proof on the issue of the State's good faith effort." Id.

In Charles Sharp, this court noted that the State had attempted to serve a subpoena on a witness who had moved out of state and also attempted to call the witness at a number that was eventually disconnected. Charles Sharp, 2010 WL 623589, at *6. The court determined that the State "should have realized early on that placing telephone calls in and of itself would not be sufficient to contact the witness in question" after six to eight months of being unable to locate her. Id. Noting the similarity to Armes, this court observed that the State had not presented any independent evidence of its efforts to locate the witness. Id. Specifically, this court said that other than proffering the subpoena and the district attorney's representations, "[t]he State failed to present any other witnesses to demonstrate the efforts extended to locate the witness." Id.

The proof in this case is more in line with that in State v. Summers, 159 S.W.3d 586 (Tenn. Crim. App. 2004), a case in which the trial court deemed unavailable a witness who appeared for the first day of trial and then did not return. This court stated:

-22-

Although the record does not resolve the question whether [the witness] was ever actually served with a subpoena, it is clear that [the witness] was aware of the proceedings and that the state sought to introduce his testimony. Moreover, it is undisputed that he intentionally absented himself from the proceedings and took steps to keep the state from discovering his whereabouts. The state presented evidence of its agents' efforts to locate the witness. [The witness's] attorney counseled him about the importance of coming to court, but he persisted in his refusal to do so. These facts all support a finding that the state made good faith efforts to locate the witness but was unable to do so. Given these facts, the presence or absence of a subpoena appears irrelevant.

Id. at 597-98.

Upon review of the proof presented concerning the State's efforts to locate Knowles and in light of the relevant case law, we cannot conclude that the trial court abused its discretion in declaring Knowles unavailable and allowing his thoroughly cross-examined testimony from the first trial to be read to the jury.

### III. Facilitation Instruction

From the record before us, it appears that the trial court did not charge the jury on facilitation.[2] At the conclusion of the proof, during the discussion of the jury charge, the State asked the court if facilitation was included in the charge, noting that its position was that it should not be. The court responded, "No, I didn't have it in there." The defendant acknowledges that he never requested the instruction either orally or in writing or assigned the failure to give the instruction as error in the motion for new trial and has therefore waived review of the issue. However, he argues that the trial court's failure to give the instruction constitutes plain error.

The doctrine of plain error provides that an appellate court may take notice of an error affecting a substantial right of the defendant, even if not raised at trial or in the motion for new trial, if the error more probably than not affected the judgment or would result in prejudice to the judicial process. Tenn. R. App. P. 36(b). In order for us to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24

---

[2]The jury charge was not included in the record on appeal. This court was informed at oral argument that a motion had been filed to supplement the record with the jury instructions.

S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "The defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial." State v. Banks, 271 S.W.3d 90, 119 (Tenn. 2008). A court's discretion to notice plain error is to be "sparingly exercised." State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007). Furthermore, consideration of all five factors is unnecessary when it is clear from the record that at least one of them cannot be satisfied. Id. at 355.

We decline to notice plain error because it is not clear that the defendant did not waive the issue for tactical reasons. See State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006) (finding no plain error in court's failure to instruct on facilitation because "[t]he defendant . . . failed to show that he did not waive th[e] issue for tactical reasons"). Here, the record shows that defense counsel was obviously present during the exchange between the State and the court regarding whether facilitation was going to be charged and presumably attentive to the colloquy. In her closing argument, defense counsel used the "facts" that allegedly support an instruction on facilitation – that a third party brought the pills and the defendant did not profit from the transaction – to argue that the defendant was only guilty of simple possession or casual exchange, offenses carrying a much lesser penalty than facilitation of a Class A felony would carry. Given our supreme court's directive that our discretion to notice plain error is to be "sparingly exercised," Bledsoe, 226 S.W.3d at 354, the defendant is not entitled to relief.

## IV. Sentencing

The defendant challenges the trial court's ordering that he serve 100% of his entire seventeen-year sentence. He asserts that the judgments reflect a release eligibility of 100% on each of his sentences, and the trial court, in its written sentencing order, referenced the Act in stating that "[t]he sentences imposed shall be served at 100% for potential parole eligibility." The defendant argues that the Drug-Free School Zone Act only provides for 100% service of the minimum sentence in the appropriate range – in this case fifteen years. The State agrees that the case should be remanded for the entry of corrected judgments.

The defendant was sentenced as a Range I offender to concurrent terms of seventeen years on his two Class A felony convictions for selling drugs in a Drug-Free School Zone. For Class A felony convictions, a Range I sentence is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). Relevant to the issue at hand, the Drug-Free School Zone Act provides:

(b)(1) A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

. . . .

(c) Notwithstanding any other provision of law or the sentence imposed by the court to the contrary, a defendant sentenced for a violation of subsection (b) shall be required to serve at least the minimum sentence for the defendant's appropriate range of sentence. Any sentence reduction credits the defendant may be eligible for or earn shall not operate to permit or allow the release of the defendant prior to full service of the minimum sentence.

(d) Notwithstanding the sentence imposed by the court, the provisions of title 40, chapter 35, part 5, relative to release eligibility status and parole, shall not apply to or authorize the release of a defendant sentenced for a violation of subsection (b) prior to service of the entire minimum sentence for the defendant's appropriate range of sentence.

. . . .

(f) Nothing in this section shall be construed as prohibiting the judge from sentencing a defendant who violated subsection (b) to any authorized term of incarceration in excess of the minimum sentence for the defendant's appropriate range of sentence.

Tenn. Code Ann. § 39-17-432(b)(1), (c), (d), (f).

Recently, in Davis v. State, 313 S.W.3d 751 (Tenn. 2010), our supreme court discussed the "minimum sentence" provisions of the Drug-Free School Zone Act in relation to the Sentencing Act's provisions for release eligibility and sentence reduction credits. The court stated that the "possibility of early release *may* be accorded to defendants who are sentenced [under the Drug-Free School Zone Act] and who are sentenced to serve a term of years greater than the minimum in their range, but only with respect to the years in excess of the minimum term." Id. at 763. The court provided the following example:

Thus, the Act allows a trial court to impose, for instance, a twenty-two-year sentence on a Range I offender for a Class A felony, of which fifteen years must be served in their entirety. With respect to the remaining term of seven years, absent a contrary plea bargain, the appropriate RED and sentence reduction credits would apply.

Id. at 763 n.18.

Davis was a habeas corpus case, and the court ultimately concluded that the defendant was not entitled to relief because a plea-bargained Range I sentence of twenty-two years with an agreement that the entire sentence be served at 100% was a legal sentence. Id. at 765. In a concurring opinion, Justice Lee stated that her

decision in this case would have been different had the trial court imposed this sentence on the defendant after a trial. However, because this was a voluntary guilty plea agreement, and not a sentence imposed by the trial court following a trial, the defendant waived any habeas corpus relief he may have been entitled to receive because the sentence he bargained for was within the statutory minimum and statutory maximum for the offense.

Id. at 766.

Despite the conclusion in Davis given the habeas corpus context, the foregoing analysis is still instructive in this case. Absent a plea bargain wherein a defendant surrenders the normal sentencing credits granted under the Sentencing Act, the Drug-Free School Zone Act requires application of release eligibility and sentence reduction credits to the portion of a defendant's sentence in excess of the statutory minimum sentence. Therefore, the defendant in this case must serve 100% of fifteen years of his sentence, and the appropriate release eligibility and sentence reduction credits apply to the remaining two years. We remand for the judgments to be corrected accordingly.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the defendant's convictions but remand for entry of corrected judgments regarding the percentage service of the defendant's sentences.

_____
ALAN E. GLENN, JUDGE

-26-