# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 2, 2009 Session

## STATE OF TENNESSEE v. CHARLES SHARP

### Appeal from the Criminal Court for Shelby County
### No. 06-02077   James C. Beasley, Jr., Judge

---

### No. W2008-01656-CCA-R3-CD  - Filed February 22, 2010

---

The Shelby County Grand Jury indicted Appellant, Charles Sharp, for one count of especially aggravated sexual exploitation of a minor, four counts of rape, one count of sexual battery by an authority figure, and one count of vandalism. An initial trial resulted in an acquittal for all charges except the especially aggravated sexual exploitation of a minor. At the second trial, a key witness was unavailable. Over the objection of Appellant, her redacted testimony from the first trial was read to the jury and presented as evidence. The jury convicted Appellant as charged. He was sentenced to nine years as a Range I, standard offender. On appeal, Appellant argues that his constitutional right of confrontation was violated by the State's presentation of the previous testimony of this witness, that the evidence was insufficient to support his conviction, that the trial court erred in sentencing Appellant to nine years as a Range I, standard offender, and that the trial court erred in denying probation. After a thorough review of the record, we have determined that the evidence is sufficient to sustain the verdict and that Appellant was properly sentenced. The State's failure to adequately prove that it had made a good faith effort to locate the missing witness' testimony from Appellant's first trial violated Appellant's constitutional right to confront the witness. Therefore, this case is reversed and remanded for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Reversed and Remanded.

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Christine W. Stephens and Brett A. Schubert, Memphis, Tennessee, attorneys for the appellant, Charles Sharp.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Pritchard, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

Appellant was employed by the Tennessee Department of Children's Services ("DCS"). Stan Lang was his supervisor. In 2005, DCS was holding "Teen Panel" meetings in Memphis during which foster children and individuals who had been in foster care would discuss their experiences with potential foster parents. Mr. Lang asked Appellant to transport several individuals who were in foster care at the time or who had been in foster care to the Teen Panel meetings. Appellant drove a van that had a driver's seat and passenger seat in the front and two rows of bench seats behind the driver's seat.

In January, February and March 2005, Appellant drove several individuals including D'Army Watson, Daisy Winston, and D.F.[1] to the Teen Panel meetings. On March 23, 2005, the meeting was held at the Centenary Methodist Church. At the time of the meeting, D.F. was fourteen, Ms. Winston was eighteen, and Mr. Watson was twenty-one. Mr. Watson brought a video camera with him to videotape the meeting. After the meeting, Appellant drove several meeting participants home. Mr. Watson began to videotape the individuals in the van. Eventually, Mr. Watson, Ms. Winston and D.F. were the only meeting participants left in the van that Appellant was driving. Mr. Watson gave Ms. Winston the video camera and asked her to record. D.F. and Mr Watson were sitting in the first bench seat directly behind Appellant and began to flirt and touch each other. Ms. Winston was videotaping the encounter.

D.F. and Mr. Watson moved to the rearmost bench seat, and D.F. was lying on her back. Mr. Watson began to fondle D.F.'s breasts after her shirt was removed. Mr. Watson proceeded to remove D.F's pants and underwear and began to digitally penetrate her. While this activity was occurring, Ms. Winston was in the bench seat immediately behind the driver's seat, videotaping Mr. Watson and D.F. Ms. Winston was using the light source on the camera to illuminate the activity between Mr. Watson and D.F. while she was filming it. Ms. Winston moved around so as to get different angles of the sexual activity for the videotape. D.F. stated that it would have been "impossible not to be noticed." The van was equipped with a functional rearview mirror.

Mr. Watson told Ms. Winston to stop filming, and he and D.F. began to have sexual intercourse in the rearseat of the van. D.F. testified that the back of the seat immediately behind the driver's seat came to the middle of her back while she and Mr. Watson were having intercourse. Appellant told Mr. Watson and D.F. to not let anyone see what they were doing and told them he would get on the expressway so it would be harder for other drivers

---

[1] It is the policy of this Court to refer to minor victims by their initials.

-2-

to see them. According to testimony at trial, Ms. Winston took the camera to the front of the van and replayed portions of the videotape for Appellant. Appellant never told the three participants to stop. Appellant took Mr. Watson home first after taking an indirect route.

After D.F. arrived home, Lieutenant Wilton Cleveland with the Memphis Police Department became involved in the case. As a result of the investigation, Lieutenant Cleveland obtained the videotape from Mr. Watson. Mr. Watson was later arrested and charged with statutory rape.

In January 2006, the Shelby County Grand Jury indicted Appellant for one count of especially aggravated sexual exploitation of a minor, four counts of rape, one count of sexual battery by an authority figure, and one count of vandalism. A trial was held on May 31, 2006, which resulted in a hung jury with regard to the especially aggravated sexual exploitation of a minor charge and acquittals for the remaining charges.

On April 28 to May 1, 2008, a new trial was held solely on the charge for especially aggravated sexual exploitation of a minor. The jury found Appellant guilty as charged. On May 29, 2008, the trial court held a sentencing hearing. At the conclusion of the hearing, the trial court sentenced Appellant to nine years as a Range I, standard offender. Appellant filed a timely notice of appeal.

## ANALYSIS

### Unavailable Witness

Appellant's first issue is that the trial court erred in declaring Ms. Winston as an unavailable witness in the second trial and allowing her redacted testimony to be read to the jury at the second trial because the trial court relied solely on representations by the State. The State argues that despite its good faith efforts, the witness could not be located, and the trial court did not abuse it discretion.

The Constitution of the United States provides the accused in a criminal prosecution the right "to be confronted with witnesses." U.S. Const. amend. VI. The Tennessee Constitution provides the right "to meet witnesses face to face." Tenn. Const. art. I, § 9.

These guaranties were created in order to: (1) have the witness testify under oath and subject to the penalties for perjury; (2) enable the fact-finder to observe the manner or demeanor of the witness and assess his or her credibility; and (3) have the witness available for cross-examination. *See Ohio v. Roberts*, 448 U.S. 56, 63-64, (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004) (internal quotation omitted);

*California v. Green*, 399 U.S. 149, (1970); *State v. Hughes*, 713 S.W.2d 58 (Tenn. 1986). Notwithstanding these objectives, the right of confrontation is not absolute and must occasionally give way to considerations of public policy and necessities of the case. *State v. Kennedy*, 7 S.W.3d 58, 65 (Tenn. Crim. App. 1999) (citing *Jenkins v. State*, 627 N.E.2d 789, 793 (Ind. 1993)). Thus, the United States Supreme Court has repeatedly refused to apply a literal interpretation of the Confrontation Clause which would bar the use of any hearsay. *Idaho v. Wright*, 497 U.S. 805, 814 (1990); *see also Sherman v. Scott*, 62 F.3d 136, 140 (5th Cir.1995), *cert. denied*, 516 U.S. 1180 (1996).

The Tennessee Supreme Court has addressed the standards and criteria that must be met in order for out-of-court statements to satisfy the Confrontation Clause of both the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Tennessee Constitution. *See State v. Armes*, 607 S.W.2d 234, 236 (Tenn. 1980); *State v. Henderson*, 554 S.W.2d 117 (Tenn. 1977). In *Henderson*, our supreme court recognized that valid claims of an unconstitutional abridgement of the right to confront witnesses arise when:

(1) [T]he hearsay evidence is crucial to proving the State's case, i.e., the evidence is offered to prove an essential element of the crime or it connects the defendant directly to the commission of the crime;

(2) there is no proof that the witness is unavailable, i.e., the State must make a good faith effort to secure the presence of the person whose statement is to be offered against the defendant; and

(3) the hearsay evidence is lacking its own indicia of reliability.

*Henderson*, 554 S.W.2d at 120.

As stated above, the prosecutor and Appellant's attorney read Ms. Winston's testimony from the previous trial into evidence. Ms. Winston testified that at the time of the first trial she was nineteen-years-old and that she had been in foster care since she was two months old. When she testified she was no longer in foster care and was living with her sister. In 2005, her caseworker, a Ms. Coleman, asked Ms. Winston to participate in the Teen Panel meetings. She stated that the purpose of the meetings was for potential foster parents to ask questions of the foster children on the panel. She started participating in the panel meetings in January. She went once a month.

Appellant provided transportation to the meetings. Ms. Winston testified that he was a DCS worker who worked in the Independent Living program. Other children also participated in the meetings, but she did not know them outside of the meetings. Ms. Winston went to the meetings in January, February and March. The victim also went to these meetings. When Appellant picked up Ms. Winston for the March meeting, Mr. Watson was already in the van. The victim was the last person to be picked up. The meeting lasted an hour and a half. After the meeting, Appellant began to drive everyone home. Everyone on the bus was pretty excited. Mr. Watson had a video camera and began taping on the van. Eventually, Mr. Watson, Ms. Winston, and the victim were the only individuals left in the van. At this point, Mr. Watson and the victim began touching each other. They were located behind the driver's and passenger's seats. The van contained individual seats for the driver and passenger and then two rows of bench seats. She stated that the rows were "very close together." Ms. Winston was in the passenger's seat at this time.

Mr. Watson asked Ms. Winston to videotape his encounter with the victim. She began to videotape them while she was seated in the passenger seat. At some point, Mr. Watson and the victim moved to the back row of the van. Ms. Winston moved to the first bench seat in order to videotape them. Ms. Winston testified that as she was videotaping the couple there would have been nothing that she knew of to obstruct Appellant's view of what they were doing. There was a functional rearview mirror in the van. At some point, Ms. Winston was not sitting on the seat videotaping, but rather standing in the walkway between the seat and the door to film from a different angle. She stated that there was nothing to obstruct Appellant's view of her standing in the walkway. Eventually, Mr. Watson asked Ms. Winston to stop videotaping. At this point, Ms. Winston testified, she took the video tape to the front of the van and held it up for Appellant to watch. As he was viewing the video tape, Appellant told Ms. Winston that she "was moving too much." While she was showing the video to Appellant, Mr. Watson and the victim were having sexual intercourse in the back row of the van. Appellant was telling the couple to change positions so that no one else outside the van could see them.

The couple engaged in intercourse until they arrived at Mr. Watson's house. Both Mr. Watson and the victim put on their clothes, and Mr. Watson got out of the van. The police came to Ms. Winston's house later that night, and she told them what had happened. Ms. Winston then identified Appellant.

Appellant's attorney read Ms. Winston's cross-examination into evidence. She was initially questioned regarding the January Teen Panel meeting. Appellant picked up Ms. Winston from her house to go to the January meeting. Both Mr. Watson and the victim were there along with some other individuals. After the meeting, Appellant drove everyone home. There were no other DCS employees in the van.

For the February meeting, Appellant once again drove Ms. Winston, Mr. Watson and the victim and other individuals to the meeting. There was not another DCS worker in the van. After the meeting, they stopped at Church's Chicken where Mr. Watson worked and ate chicken. After eating at Church's, Appellant had to find someone who had run away. He took the children in the van with him to look for the runaway. He drove to an apartment complex and got out of the van. He left the children from the Teen Panel meeting in the van. While he was away from the van, Mr. Watson and the victim "began touching each other." The victim also asked Ms. Winston to touch her, and she did. Ms. Winston testified that Mr. Watson and the victim "were going together." Appellant came back to the van and asked them what they were doing.

For the March meeting, once again, Appellant was the only DCS worker in the van. Appellant drove several individuals to them meeting. When he picked up Ms. Winston, everyone except the victim was already in the van. They picked up the victim and proceeded to the meeting. With regard to the van, Ms. Winston agreed that the seat back of the driver's seat came to the back of Appellant's head. She also agreed that there were two cushions on either side of the first bench seat. She testified that she was in the walkway. She stated that if he looked in the rearview mirror he could see Mr. Watson and the victim.

Ms. Winston testified that she did not know why Mr. Watson brought the video camera that night. She stated that she did not own one, but she had seen them before. Mr. Watson showed her how to operate it. Mr. Watson had already turned on the camera for her. He told her how to stop it. Ms. Winston testified that she did not know how to rewind it. Mr. Watson asked Ms. Winston to video tape his sexual activities with the victim. He asked her while she was sitting in the passenger seat and Appellant was in the driver's seat. Ms. Winston was eighteen at the time of the March meeting. She was not sure how old the victim was because the victim kept telling everyone different ages. Ms. Winston did not find out how old the victim was until she spoke with the police.

On cross-examination, Ms. Winston agreed that while she was filming, she told the victim to pull her shirt back up and told Mr. Watson to open the victim's vagina with his fingers. Ms. Winston testified that she showed the video to Appellant because he wanted to see it. When they arrived at Mr. Watson's house, the victim also got out. Appellant said, "don't be as long as you all was the last time." The victim was talking to Mr. Watson and his brother while Appellant spoke with Mr. Watson's mother.

It is clear that Ms. Winston's testimony is crucial to the State's case. Her testimony demonstrates that Appellant knew that she was videotaping Mr. Watson's and the victim's sexual activity. She stated that Appellant would have been able to see her videotaping;

-6-

would have been able to see Mr. Watson and the victim engaging in sexual activity; and wanted to see the video. She also testified that she showed him the video and he told her that she was "moving too much." This testimony proves that Appellant was permitting a minor to participate in the production of a videotape showing the minor engaging in sexual activity, which are the requirements for a violation of Tennessee Code Annotated section 39-17-1005(a), especially aggravated exploitation of a minor.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court announced the test to determine admissibility under the Confrontation Clause of hearsay offered against an accused. Testimonial statements such as redacted transcript in this case may not be offered into evidence unless two requirements are satisfied: (1) the declarant/witness must be unavailable and (2) the defendant must have had a prior opportunity to cross-examine the declarant/witness. *Id.* at 68. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69.

There is no question in the case at hand that Ms. Winston's prior testimony would be considered testimonial. Rather, the question raised is whether or not the State proved that Ms. Winston was "unavailable." As stated above, our supreme court stated in *Henderson* that the State must prove that it made a good faith effort to secure the presence of the witness in question. "Good faith" has been defined as "[t]he lengths to which the prosecution must go to produce a witness . . . [and] is a question of reasonableness." *Roberts*, 448 U.S. at 74. The decision of the trial court will be affirmed absent an abuse of discretion. *Hicks v. State*, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

In *State v. Armes*, 607 S.W.2d 234 (Tenn. 1980), our supreme court visited the issue as to what constitutes a good faith effort. 607 S.W.2d at 237. In *Armes*, the State attempted to subpoena the witness before trial and discovered that the witness had disappeared. *Id.* at 236. This disappearance resulted in a mistrial. *Id.* One week before the second trial and again one day before the second trial, the State attempted to subpoena the witness. Not surprisingly, the State was unable to locate the witness. *Id.* At trial the State attempted to present the testimony of the witness at the preliminary hearing. *Id.* To prove the witness's unavailability, the State failed to provide any independent evidence of an attempt to locate the witness other than a statement by the prosecutor. Our supreme court stated, "The prosecuting attorney's statement to the Court concerning the efforts of the State's investigator to locate the witness cannot be considered as evidence of proof on the issue of the State's good faith effort." *Id.* at 237. Our supreme court also stated that the State was on notice that extra effort would be required to locate the witness because he did not appear for the first trial date. *Id.*

As in *Armes*, in the case at hand, the State did not provide any independent evidence of its efforts to locate Ms. Winston. A copy of the subpoena dated September 4, 2007, was included in the record. Handwritten on the subpoena was a notation that Ms. Winston had moved to Atlanta, Georgia. At a hearing on the matter, the State presented the subpoena then stated on the record after contacting Ms. Winston's foster mother the State acquired a telephone number and had repeatedly tried to contact Ms. Winston by telephone over a six to eight month period. At some point, according the assistant district attorney, the telephone was disconnected.

By the State's own admission, it had been attempting to locate Ms. Winston for six to eight months. It appears that the State should have realized early on that placing telephone calls in and of itself would not be sufficient to contact the witness in question. The State failed to present any other witnesses to demonstrate the efforts extended to locate the witness. We conclude that the State has not proven that it made a good faith effort to locate Ms. Winston and, therefore, cannot meet the requirement that it has proven that Ms. Winston was unavailable under the test set out in *Crawford*. The trial court abused its discretion in allowing her testimony from the prior trial to be read at trial and entered as evidence.

Appellant's constitutional right to confrontation has been breached, and this requires that his conviction be reversed based upon this fact alone. However, as required by our supreme court, we address Appellant's other issues.

## Sufficiency of the Evidence

Appellant also argues that the evidence was insufficient to support his conviction. The State contends that the evidence was sufficient.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences

that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

Appellant argues that the evidence presented by the State is purely circumstantial. A criminal offense may be established exclusively by circumstantial evidence. *State v. Tharpe*, 726 S.W.2d 896, 900 (Tenn.1987); *State v. Jones*, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995). However, the trier of fact must be able to "determine from the proof that all other reasonable theories except that of guilt are excluded . . . ." *Jones*, 901 S.W.2d at 396; *see also, e.g.*, *Tharpe*, 726 S.W.2d at 900. We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779.

In addition, we point out that the United States Supreme Court has held that when a conviction is reversed due to the admittance of inadmissible evidence the appellate court must still consider the evidence in question when determining whether the evidence was sufficient to support he conviction. *Lockhart v. Nelson*, 488 U.S. 33, 40-42, 109 S. Ct. 290-91 (1988). With this in mind, we now turn to our review.

Appellant was convicted of violating Tennessee Code Annotated section 39-17-1005(a), especially aggravated exploitation of a minor, which states:

(a) It is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in:

(1) Sexual activity; or

(2) Simulated sexual activity that is patently offensive.

When taken in the light most favorable to the State, the evidence shows that Appellant was transporting the victim and other individuals in a van to their homes from an evening meeting for potential foster parents set up by DCS. When only the victim, Ms. Winston, and Mr. Watson remained in the van, the victim and Mr. Watson began to engage in sexual conduct. Ms. Winston began filming the encounter under Mr. Watson's direction. During the filming the victim was undressed, and Mr. Watson fondled her breasts and digitally

penetrated her. The witnesses at trial testified that the video camera had an attached light source that was used during the filming. This film was shown to the jury. The victim and Mr. Watson were in the rearmost seat of the van. According to the witnesses at trial, Appellant told Mr. Watson and the victim to not let other drivers on the road see that they were having intercourse and that he would get on the expressway. There was also evidence presented that Ms. Winston showed the video of Mr. Watson's and the victim's sexual encounter immediately after filming it.

We conclude that a reasonable trier of fact could determine that Appellant had ample knowledge of Mr. Watson's and the victim's sexual activities two rows behind him in the van. It is reasonable from the evidence presented, for the jury to conclude that Appellant knew of both the video taping and the sexual activity occurring two rows behind him in the van. As stated above, we may not substitute our own judgment for that of the jury. Sufficient evidence was presented to support the jury's conclusion.

Therefore, this issue is without merit.


## Sentencing

Appellant also argues on appeal that the trial court erred in denying probation and in imposing a nine year sentence. The State argues that the trial court did not err.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the presentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. T.C.A. §§ 40-35-103(5), -210(b); *Ashby*, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *Ashby*, 823 S.W.2d at 169. In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information

offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

In response to *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531(2004), the Tennessee Legislature amended Tennessee Code Annotated section 40-35-210. *Compare* T.C.A. § 40-35-210(c) (2003) *with* T.C.A. § 40-35-210(c) (2006). This amendment became effective on June 7, 2005. The legislature also provided that this amendment would apply to defendants who committed a criminal offense on or after June 7, 2005. 2005 Tenn. Pub. Act ch. 353, § 18. In addition, if a defendant committed a criminal offense on or after July 1, 1982 and was sentenced after June 7, 2005, such defendant can elect to be sentenced under these provisions by executing a waiver of their ex post facto protections. *Id.* Appellant herein committed the offenses prior to June 7, 2005, and there is no ex post facto waiver executed by Appellant in the record herein. Thus, the amendments to Tennessee Code Annotated section 40-35-210 do not apply to Appellant.

Length of Sentence

Appellant did not raise at the sentencing hearing or on appeal any claim that the judge's findings of the above-described enhancement factors violated his rights under the Sixth Amendment pursuant to *Blakely v. Washington*, 542 U.S. 286 (2004). However, without reciting the long line of jurisprudence beginning with *Blakely* and ending in this State with *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007), it now appears to be settled law that under the Sixth Amendment's provision for a right to a jury trial only a jury may make the factual findings necessary to lengthen a sentence beyond the sentence actually authorized by the verdict of guilt. *Id.* at 740. The only exceptions to this requirement are enhancing a sentence based on a record of prior convictions or if the defendant admits to the enhancement factors. *Cunningham v. California*, 549 U.S. 270, 275, 127 S. Ct. 856, 860 (2007).

Appellant was convicted of Tennessee Code Annotated section 39-17-1005(a), especially aggravated exploitation of a minor, which is a Class B felony. The trial court determined that Appellant was a Range I, standard offender. At the sentencing hearing the trial court applied the enhancement factors that Appellant had a previous history of criminal convictions or criminal behavior and that Appellant abused a position of public or private trust. T.C.A. § 40-35-114(1), (14) (2003). The trial court did not find any statutory mitigating factors but stated that Appellant's "educational ability," his maintenance of employment for a substantial time period, and seeking and obtaining custody of his children weighed in his favor. After applying enhancement and mitigating factors the trial court sentenced Appellant to nine years.

As stated above, a trial court is allowed to apply enhancement factors under *Blakely* and its progeny that are either prior criminal history or facts admitted by the defendant. There is no dispute that the trial court properly applied these two factors. Appellant's presentence report clearly shows that he has a history of prior criminal convictions and conduct. At trial, Appellant testified that as part of his employment with DCS he was required to transport the minor victim and the other individuals to a DCS meeting held for potential foster parents. We agree with the trial court that Appellant was indeed placed in a position of trust in that he was entrusted with the care of the individuals he transported in the van.

We find that the application of these two enhancement factors supports the trial courts increase of the minimum sentence by one year from eight years to nine years.

Therefore this issue is without merit.

<u>Probation</u>

Appellant also argues that the trial court erred in refusing to grant probation. A defendant convicted under Tennessee Code Annotated section 39-17-1005 at this time is not eligible for probation. T.C.A. § 40-35-303 (Supp. 2008). However, at the time Appellant committed the offense, it was not a prohibited offense in regard to the granting of probation. Therefore, the current prohibition does not apply to Appellant.

At the time Appellant committed the offense in this case Tennessee Code Annotated § 40-35-102(5) provided as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

T.C.A. § 40-35-102(5)(2003).

A defendant who does not fall within this class of offenders "and who is an especially mitigated offender or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." T.C.A. § 40-35-102(6) (2003). Furthermore, unless sufficient evidence rebuts the presumption, "[t]he trial court must presume that a defendant sentenced to eight years or less

-12-

and not an offender for whom incarceration would result in successful rehabilitation . . . ." *State v. Byrd*, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993); *see also* T.C.A. § 40-35-303(a).

All offenders who meet the criteria are not entitled to relief; instead, sentencing issues must be determined by the facts and circumstances of each case. *See State v. Taylor*, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987) (citing *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). Even if a defendant is presumed to be a favorable candidate for alternative sentencing under Tennessee Code Annotated § 40-35-102(6), the statutory presumption of an alternative sentence may be overcome if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

T.C.A. § 40-35-103(1)(A)-(C). In choosing among possible sentencing alternatives, the trial court should also consider Tennessee Code Annotated § 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5); *State v. Dowdy*, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. *See State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); *see also State v. Bunch*, 646 S.W.2d 158, 160-61 (Tenn. 1983); *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); *State v. Williamson*, 919 S.W.2d 69, 84 (Tenn. Crim. App. 1995); *State v. Dowdy*, 894 S.W.2d at 305-06.

In this case, Appellant was convicted of a Class B felony and sentenced to more than eight years. Thus, he is not presumed a favorable candidate for alternative sentencing in the absence of evidence to the contrary. The trial court noted that Appellant had violation of probation from a prior conviction. The trial court was more troubled by the fact that Appellant continued to deny any responsibility for the offense and for that reason questioned Appellant's potential for rehabilitation.

We find that there is ample support for the trial court's refusal to grant probation. Therefore, this issue is without merit.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the trial court is reversed.


_____
JERRY L. SMITH, JUDGE