# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
March 4, 2014 Session

## STATE OF TENNESSEE v. CHARLES SHARP

**Direct Appeal from the Criminal Court for Shelby County**
**No. 0602077      James Lammey, Judge**

---

**No. W2013-00330-CCA-R3-CD - Filed July 28, 2014**

---

Defendant, Charles Sharp, was originally indicted for one count of especially aggravated sexual exploitation of a minor, four counts of rape, one count of sexual battery by an authority figure, one count of statutory rape, and one count of vandalism under $500. Defendant was acquitted of all charges except especially aggravated sexual exploitation of a minor, on which the jury was hung. *See State v. Sharp*, 327 S.W.3d 704, 708 (Tenn. Crim. App. 2010). Defendant was tried again on the charge of especially aggravated sexual exploitation of a minor and convicted. *Id*. This court reversed Defendant's conviction and remanded for a new trial based on the State's having read a witness's testimony from a prior trial into evidence without having shown the witness's unavailability. *Id*. at 709-712. Defendant was tried twice more on the charge of especially aggravated sexual exploitation of a minor, and the juries were unable to reach a verdict. In the case sub judice, Defendant was tried and convicted again on the same charge and sentenced to 12 years of incarceration. Defendant now appeals his conviction and sentence and asserts the following: 1) the trial court erred by not dismissing the indictment pursuant to our supreme court's holding in *State v. Witt*, 572 S.W.2d 913, 917 (Tenn. 1978); 2) the trial court erred by allowing into evidence testimony of prior bad acts; and 3) the trial court's imposition of a 12-year sentence was presumptively vindictive. After a careful review of the record and the briefs of the parties, we affirm Defendant's conviction; however, we conclude that Defendant's sentence violates *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and therefore, we modify Defendant's sentence from twelve years to ten years.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed in Part, Reversed in Part**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

R. Todd Mosley, Memphis, Tennessee, (on appeal); Kim Sims and Larry Sims, Memphis, Tennessee, (at trial), for the appellant, Charles Sharp.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Kirby May and Jennifer Nichols, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

The 14-year-old victim in this case, whom we will refer to by her initials, D.F., was in foster care at the time of the incident. In February 2005, she attended a teen panel meeting. She rode to the meeting in a van driven by Defendant, a case manager with the Department of Children's Services ("DCS"). 21-year-old D'Army Watson and D.W. were also passengers in the van. Mr. Watson testified that Defendant "was a friend [and] mentor" to him. He testified that Defendant gave him advice about sex, and Mr. Watson had expressed his interest in D.F. to Defendant.

During the ride home from the February teen panel meeting, Defendant stopped at the Foote Homes housing development to pick up a runaway child. Defendant left the van for approximately 30 minutes. Mr. Watson testified that he, D.W. (a female), and D.F. were "touching and feeling" each other. Mr. Watson touched D.F.'s breasts and vagina, and they kissed. Mr. Watson also took photographs of D.F.'s breasts and vagina with his cell phone. Defendant returned to the van with the runaway girl, and he said that "it smell[ed] like sex" in the van. Mr. Watson, D.F., and D.W. laughed off Defendant's comment. Mr. Watson then showed Defendant the cell phone photos. Defendant looked at the photos with "a little smirk" and kept driving.

On March 23, 2005, Defendant again drove Mr. Watson, D.F., and D.W. to a teen panel meeting. During the ride home, they drove around listening to loud music. Mr. Watson testified that after all the passengers except D.F., D.W., and himself were dropped off, Defendant changed the radio station from rap to "romantic" music. Mr. Watson sat in the front passenger seat, and he was using his video camera to record everyone "having fun" and "cracking jokes" about marijuana. The video camera had a light on it that lit up the van while the camera was recording. Mr. Watson moved from the front seat to the first row in the van, and D.F. gave him a lap dance. D.W. moved to the front passenger seat and used Mr. Watson's video camera to record Mr. Watson and D.F., who then moved to the back row of the van, where they had sex. When the sexual contact escalated to intercourse, Mr.

-2-

Watson told D.W. to stop recording. Defendant told Mr. Watson and D.F. to "slouch down" so other people could not see.

Defendant's supervisor testified that it was a policy of DCS that male caseworkers not transport females without a female caseworker present unless prior approval is given. Defendant did not request approval prior to transporting females to and from the teen panel meetings. There was no female caseworker present during the February or March 2005 van rides.

D.W. testified that during the ride home from the February meeting, while they were stopped at the Foote Homes housing development and Defendant had left the van, she acted as the "lookout person" while Mr. Watson and D.F. had sexual intercourse. She testified that she did not want Mr. Watson and D.F. "to get in trouble." D.W. testified that after the March 2005 meeting, Defendant dropped off the other passengers in the van, and Mr. Watson, D.F., and D.W. were the only passengers remaining in the van. Mr. Watson showed her how to use the video camera, and she began recording Mr. Watson and D.F. Mr. Watson then asked her to stop recording. D.W. testified that while Mr. Watson and D.F. were having sex, Defendant told D.F. to "lower her ass" because he thought that people in other cars around them could see her. D.W. showed the video to Defendant, and after Defendant watched the video, he asked, "[t]hat's it?" and told D.W. that she moved the camera too much. D.W. told Defendant that D.F. was "going to end up getting pregnant on one of these trips," and Defendant did not respond. When Defendant stopped to drop off Mr. Watson, D.F. also got out of the van to hug and speak to Mr. Watson's brother. When D.F. returned to the van, she made sexual comments about Mr. Watson's brother, saying that she believed he could maintain an erection longer than Mr. Watson. Defendant then asked D.F., "'so [Mr. Watson] couldn't stand up to his words?'"

Defendant then asked D.W. to sit beside D.F. He asked D.W. and D.F. to take off their clothes, and they did. Defendant reached back from the driver's seat and touched D.W.'s vagina. He then told D.F. to perform oral sex on D.W.. Defendant touched D.W.'s breasts and vagina while D.F. performed oral sex. Defendant then told D.W. to perform oral sex on D.F., and D.W. told Defendant that she did not know how. She testified that Defendant told her to put her mouth on D.F.'s vagina. When D.W. finished, Defendant put his penis to D.F.'s mouth. D.F. refused to perform oral sex on Defendant. Defendant told D.W. to take her clothes off, and he said that he wanted D.W. and D.F. to give each other simultaneous oral sex. D.W. and D.F. refused. Defendant told D.W. "how good [she] felt down there" and asked her if he could be "[her] first." He told D.W. that "any man would love to have sex with [her]." Defendant relented when D.W. and D.F. refused Defendant's requests. He then drove D.F. and D.W. home. D.W. got out of the van, and Defendant told her "'don't let me down next time.'" D.F. testified that after Defendant dropped off D.W.,

he continued to pressure D.F. to perform oral sex on him, and Defendant pulled out his penis again, but D.F. refused.

Estella Lee Anderson was D.W.'s foster mother. When D.W. arrived home, she began crying, and Ms. Anderson called the police. D.W. said, "'I just don't want to get nobody in trouble.'" Officer Steven Grigsby of the Memphis Police Department responded to Ms. Anderson's call. Officer Grigsby testified that D.W. "was obviously very upset" and that she "appeared traumatized." D.W. told Officer Grigsby what had happened.

Lieutenant Wilton Cleveland interviewed Mr. Watson at the Church's Chicken restaurant where Mr. Watson worked. Mr. Watson told Lieutenant Cleveland that Defendant was aware of the sexual activity in the van and the video recording. While Lieutenant Cleveland was interviewing Mr. Watson, Defendant arrived at the Church's Chicken. Lieutenant Cleveland also spoke to Defendant. Lieutenant Cleveland testified that Defendant was cooperative and that Defendant "was just kind of curious as to what happened[.]" Lieutenant Cleveland recovered a video camera and videotape from Mr. Watson's home. The videotape was a recording of the incident in the van in March 2005, showing sexual activity between Mr. Watson and D.F. Police took Defendant into custody, and Lieutenant Cleveland interviewed Defendant again at the police station. Defendant admitted to detectives that he had violated the DCS rule about having female passengers in the van without a female caseworker present. Defendant also told detectives that he knew his passengers were doing something with the camera in the back of the van, but he was not sure what they were doing. Lieutenant Cleveland testified that he stepped out of the interview room at one point and observed Defendant through the window. Defendant appeared "very agitated," and he picked up the interview room table and "slammed" it on the floor and broke it. Lieutenant Cleveland and two other officers returned to the interview room. As they entered, Defendant was picking up a chair, and the officers had to physically restrain Defendant. This interaction concluded the interview.

Defendant testified that he did not say that the van smelled like sex during the February 2005 incident. He acknowledged that he told the teen runaway he picked up that she "smelled like smoke and sex." Defendant denied looking at any photos taken on Mr. Watson's cell phone. He acknowledged that during the March 2005 van ride, he allowed passengers to discuss drugs. He testified that he dropped off D.W., D.F., and Mr. Watson last because they lived closest to the location where he was picking up his own children. Defendant testified that Mr. Watson, D.W., and D.F. were "laughing and playing with the camera," and he told them to put the camera away and sit down in the van. Defendant denied that he changed radio stations to provide mood music. Defendant denied that he knew D.W. was recording video of sex acts between Mr. Watson and D.F. He denied that he encouraged sexual activity between his passengers. Defendant testified that he dropped off D.W. and

D.F. without having "much conversation with them, period." Defendant denied that he asked D.W. and D.F. to touch each other or him sexually. On cross-examination, Defendant testified that he was not "some kind of pedophile."

Defendant acknowledged that his behavior while driving was inappropriate and he acknowledged that he was aware that Mr. Watson was recording video while Mr. Watson was seated beside him in the front passenger seat. Defendant testified that he believed the video camera had been put away, and he did not know anything was happening in the back seat of the van.

On rebuttal, the State called S.T. to testify. S.T. testified that in early 2005, when she was 12 years old, Defendant picked her up and drove her to his house, where he kissed her. She pushed Defendant away. When they were leaving, Defendant touched her breasts. S.T. did not report the incident immediately because she had been molested before. She eventually told a school counselor about the incident. She testified that Defendant offered her $5,000 not to testify about the incident, and she refused to accept the money.

*Analysis*

*Dismissal of indictment*

Defendant contends that the trial court abused its discretion by not dismissing the indictment following several prior mistrials. In his first trial, Defendant was acquitted of sexual battery and several counts of rape, and the jury was hung as to the present charge of especially aggravated sexual exploitation of a minor. *State v. Sharp*, 327 S.W.3d 704 (Tenn. Crim. App. 2010). A second trial resulted in Defendant's conviction for especially aggravated sexual exploitation of a minor, which was reversed for prejudicial error. *Id*. at 712. Defendant was tried on that charge a third and fourth time, and both trials resulted in mistrials because of hung juries. The fifth trial resulted in Defendant's conviction underlying this appeal.

Defendant cites *State v. Witt*, in which our supreme court held that trial judges have the inherent discretionary authority to terminate a prosecution where repeated trials, free of prejudicial error, have resulted in genuinely deadlocked juries and where it appears that at future trials substantially the same evidence will be presented and that the probability of continued hung juries is great. 572 S.W.2d 913, 917 (Tenn. 1978). The court held that "[r]equiring defendants to face additional juries with the continuing prospect of no verdict offends traditional notions of fair play and substantial justice." *Id*. In *Witt*, the trial court dismissed the indictments against the defendants following three prior mistrials resulting from deadlocked juries. *Id*. at 914. The trial court heard testimony from jurors from each of the three trials, all of whom "expressed the opinion that no future jury would agree on a

verdict, assuming the presentation of substantially the same evidence which they had heard." *Id*. The supreme court in *Witt* noted that the opinion was "not to be construed as fixing the permissible or impermissible number of mistrials caused by deadlocked juries" and that the exercise of judicial discretion to terminate a criminal prosecution "is a power that ought to be used with the greatest caution and only in the most urgent circumstances and for very plain and obvious causes." *Id*.

Defendant argued to the trial court for dismissal of the indictment; however, Defendant did not cite *State v. Witt*. The trial court denied Defendant's motion to dismiss the indictment based on repeated trials, stating as follows:

> But I still don't see where I have authority to dismiss a valid indictment. I can't just dismiss it if I want to. It would be kind of neat if I could do that. I'd probably have a lot less cases pending but I can't do that. You know I can't do that.

The State argues that this case is distinguishable from *Witt* in that Defendant did not present any evidence from jurors in prior trials that no jury could ever agree on a verdict if presented with substantially the same evidence as presented in past trials. The State notes that in denying Defendant's motion for judgment of acquittal, the trial court stated, "[t]he best proof ever, I've ever seen on any case in my career has been presented in this trial." The trial court also stated, "I don't know how in the heck a jury could have found someone not guilty of this." Defendant, however, relies upon three jury notifications, filed supplemental to the record in this case, in which the jury advised the trial court in Defendant's fourth trial that it was deadlocked. The notifications state that the jury is "hopelessly deadlocked" and that the jury was "split 6 to 6."

We conclude that the trial court did not abuse its discretion by not dismissing the indictment against Defendant. The trial court was aware that Defendant had been convicted once before of the charge on the evidence, and the trial court believed the evidence against Defendant to be strong. Although the record shows that the jury in Defendant's fourth trial sent three notifications that it was "hopelessly deadlocked" and "split 6 to 6," there was no evidence presented from Defendant that no jury could ever agree on a verdict if presented with substantially the same evidence as presented in past trials. Defendant is not entitled to relief on this issue.

*Prior bad acts evidence*

Defendant contends that the trial court erred by allowing into evidence the incidents from the February 2005 van ride, conduct that occurred during the March 2005 van ride after

Mr. Watson was dropped off, and the testimony of S.T. about acts that occurred in January 2005.

It is well-established precedent "that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Tennessee Rule of Evidence 404(b) permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. Tenn. R. Evid. 404(b) Advisory Comm'n Cmts.; *see State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985); *State v. Hooten*, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987). However, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Before admitting evidence under Rule 404(b), the rule provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; (3) the court must find proof of the other crime, wrong, or act to be clear and convincing; and (4) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value. Tenn. R. Evid. 404(b).

The rationale underlying Rule 404(b)'s exclusion of evidence of a defendant's prior bad acts is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. *Id*.; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996).

Defendant was convicted of violating Tennessee Code Annotated section 39-17-1005(a), especially aggravated exploitation of a minor, which makes it an offense to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in sexual activity.

Defendant contends that the trial court erred by admitting evidence of the events that occurred during the February 2005 van ride. Following a jury-out hearing to determine the

admissibility of the evidence, the trial court found that the evidence was "highly probative to show [Defendant's] intent or lack of mistake, it's highly probative to just their relationship to one another and the whole background of this case culminates in what happened in March." The trial court found that the evidence was relevant to "tell[] the whole story. It shows that [Defendant] had knowledge of this."

We agree with the trial court's conclusion that evidence of acts that occurred during the February 2005 van ride was probative to establish that Defendant was aware of sexual conduct between Mr. Watson and D.F., and he was aware of sexual photographs taken during that interaction. The evidence rebuts Defendant's claim that he was unaware during the March 2005 van ride that Mr. Watson and D.F. had a sexual encounter that was being recorded on video.

Defendant also asserts that evidence of conduct that occurred after Defendant dropped off Mr. Watson during the March 2005 van ride was improperly admitted. Regarding evidence of the conduct that occurred on the same night as the incident for which Defendant was charged, the trial court found that the incidents were "all related" and that the events of that night were not evidence subject to a Rule 404(b) hearing. In denying Defendant's motion for judgment of acquittal, the trial court noted,

> [Evidence of] the events that transpired immediately thereafter is probably the best circumstantial proof I've ever seen to point – that points to what knowledge [Defendant] had of this video being taken. And because of the way he acted afterwards and the things that he did afterwards is a direct result of knowing about this video. He knew these kids were easy prey. That's what he did.

The court likened the evidence to evidence of flight and concluded that it was "part and parcel" of the same event.

Defendant contends that the trial court erred by allowing the evidence because it was evidence of a prior acquittal. *See State v. Sharp*, 327 S.W.3d 704 (Tenn. Crim. App. 2010). Defendant relies upon the holding in *State v. Holman*, 611 S.W.2d 411, 413 (Tenn. 1981), in which the Tennessee Supreme Court held that where a defendant has been acquitted of an alleged prior crime, evidence of that prior crime cannot be "clear and convincing" for Rule 404(b) purposes. The State asserts that *Holman* is not applicable to the present case because the trial court properly determined that the evidence in question was not evidence of prior bad acts and was therefore not subject to Rule 404(b) analysis. We agree with the State that *Holman* is distinguishable from the present case. *Holman* involved a separate crime,

committed on another occasion, whereas the acts admitted as evidence in this case occurred on the same night, during the same van ride.

Furthermore, our supreme court has recognized that "the holding in *Holman* represents a minority rule among the states," and has indicated its willingness to revisit the holding. *State v. Little*, 402 S.W.3d 202, 214 (Tenn. 2013). This court has declined to extend the holding in *Holman* to sentencing hearings, noting that for consecutive sentencing purposes, "an acquittal is not viewed to negate the possibility that criminal involvement may be shown to have existed by a preponderance of the evidence." *State v. Desirey*, 909 S.W.2d 20, 31 (Tenn. Crim. App. 1995). This court also noted that an "acquittal is normally not considered for evidentiary purposes to equate with factual innocence, only with the existence of a reasonable doubt." *Id*.

Nevertheless, even assuming the holding in *Holman* is applicable to the present case and the trial court erred in admitting evidence of the acts that occurred during the March 2005 van ride after Defendant dropped off Mr. Watson, we conclude that any error was harmless in light of the evidence against Defendant. *See* Tenn. R. App. P. 36(b) (A defendant will not be entitled to relief unless the error "more probably than not affected the judgment or would result in prejudice to the judicial process."); *see also State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008).

Here, the evidence established that Defendant was aware in February 2005 that his passengers in March 2005 were inclined to engage in sexual activity and photograph or video the sexual activity. In February 2005, Defendant viewed sexual photographs taken during the van ride. Defendant had encouraged Mr. Watson to pursue a sexual relationship with D.F. In March 2005, Defendant dropped off all of his passengers except the three passengers who had previously engaged in sexual activity in the van. Defendant then changed the radio station to more "romantic" music. There was a light on the video camera that was on while the camera was recording. D.W. was seated in the front passenger seat beside Defendant when she began recording D.F. giving Mr. Watson a "lap dance" in the row directly behind Defendant. While Mr. Watson and D.F. had sex in the back row of the van, D.W. showed the video to Defendant, and Defendant asked "[t]hat's it?" and criticized D.W.'s video recording skills. Defendant told Mr. Watson and D.F. to "slouch down" so that other people could not see them having sex. In an interview with police, Defendant admitted that he knew that his passengers were doing something with the camera in the back of the van, but he did not know what they were doing. When investigators stepped out of the interview room, Defendant became enraged and broke the table.

We conclude that even if the trial court erred by allowing into evidence acts that occurred after Mr. Watson was dropped off during the March 2005 van ride, any error was harmless.

Defendant also suggests that evidence of the acts that occurred after Mr. Watson was dropped off could support a separate count of especially aggravated sexual exploitation of a minor, and the State did not make a proper election of offenses. The State argues that Defendant has waived consideration of the issue by his failure to raise it in his motion for new trial. We agree. Issues relating to the admission or exclusion of evidence that are not raised in a motion for new trial are deemed to be waived on appeal. *See* Tenn. R .App. P. 3(e). Nevertheless, we conclude that the issue is without merit. The instructions given to the jury on the offense of especially aggravated sexual exploitation of a minor state in part that the elements of the offense include, "that the defendant did permit a minor to participate in the performance or in the production of material which includes the minor engaging in sexual activity." "Material" was defined as "any videocassette tape or other pictorial representation" or "any text or image stored on a computer hard drive, a computer disk of any type, or any other medium designed to store information for later retrieval."

The acts that occurred after Mr. Watson was dropped off did not include any videotaping or photographing of sexual acts with a minor. D.W. and D.F. testified that Defendant attempted sexual activity with them after Mr. Watson was dropped off. There was no testimony that either of them participated in the performance or production of material including D.F. engaging in sexual activity after Mr. Watson was dropped off. Therefore, there was no danger of a non-unanimous verdict. Defendant is not entitled to relief on this issue.

Finally, Defendant asserts that the trial court erred by allowing the State to present testimony by S.T. to rebut Defendant's testimony that he was not a pedophile. The State argues that the evidence was properly admitted under Rule 404(b) and that the trial court properly allowed the evidence as substantive character rebuttal evidence.

The trial court determined in a jury-out hearing that the evidence was relevant to show Defendant's opportunity, knowledge, and intent. The court noted that the evidence showed that Defendant had unsupervised access to children in DCS care, and the court found that the evidence was relevant to show that Defendant "knowingly allowed this video to be made." The trial court found that S.T.'s testimony was clear and convincing evidence of the prior bad act and that the probative value of the evidence was not outweighed by the prejudicial effect.

The trial court substantially complied with the requirements of Rule 404(b), and we conclude that the trial court did not abuse its discretion by finding that the evidence was

probative of a material issue other than showing that Defendant acted "in conformity with [a] character trait." Tenn. R. Evid. 404(b). Additionally, Rule 404(a) permits the prosecution to rebut character evidence of a pertinent character trait offered by the accused. Defendant testified, without prompting, that he was not a pedophile. The State argues that Defendant "opened the door" to the issue of his character, entitling the State to rebut the evidence. We agree. S.T.'s testimony was admissible to impeach Defendant's unsolicited testimony that he was not a pedophile.

*Sentencing*

Defendant contends that his 12-year sentence is "presumptively vindictive." Defendant argues that although the trial court "clearly explained" its reasons for imposing the sentence, it did not explain why Defendant's conviction in this case warranted a greater sentence than Defendant received following his prior conviction, for which Defendant received a nine-year sentence.

The United States Supreme Court has held that a harsher sentence after a new trial raises a presumption of "judicial vindictiveness," which may be overcome by an affirmative showing on the record of the reasons for the harsher sentence. *North Carolina v. Pearce*, 395 U.S. 711, 725-26, 89 S. Ct. 2072, 2080-81, 23 L. Ed. 2d 656 (1969). In subsequent cases, the Court clarified that the presumption of vindictiveness announced in *Pearce* "'do[es] not apply in every case where a convicted defendant receives a higher sentence on retrial.'" *See Alabama v. Smith*, 490 U.S. 794, 799, 109 S. Ct. 2201, 2204, 104 L. Ed. 2d 865 (1989) (quoting *Texas v. McCullough*, 475 U.S. 134, 138, 106 S. Ct. 976, 979, 89 L. Ed. 2d 104 (1986)). The Supreme Court limited the application of *Pearce* to circumstances "in which there is a 'reasonable likelihood' . . . that the increase is the product of actual vindictiveness on the part of the sentencing authority. Where there is no such reasonable likelihood, the burden remains upon the defendant to prove actual vindictiveness." *Smith*, 490 U.S. at 801 (citing *Wasman v. United States*, 468 U.S. 559, 569, 104 S. Ct. 3217, 3223, 82 L. Ed. 2d 424 (1984)).

We conclude that there is not a reasonable likelihood that the imposition of Defendant's 12-year sentence is the product of presumptive or actual vindictiveness. We base this conclusion upon the fact that two different trial judges presided over Defendant's sentencing in this trial and in the preceding trial, in which Defendant received a 9-year sentence. The "risk of vindictiveness by [a second] trial judge being confronted by resentencing is nonexistent." *State v. Brian Milam*, No. M2008-00695-CCA-R3-CD, 2010 WL 744398, at *23 (Tenn. Crim. App. Mar. 3, 2010), *perm. app. denied* (Tenn. Aug. 26, 2010).

However, our review of the record in this case leads us to conclude that the sentence was nevertheless erroneous because it violates the principles of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). After a thorough review, we conclude that the trial court improperly considered enhancement factors other than Defendant's prior convictions in determining the length of Defendant's sentences.

At the sentencing hearing, the trial court recognized that the offense occurred prior to the June 7, 2005 changes to the sentencing laws. The court found that Defendant was a Range I offender and that he had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range. The trial court also found that Defendant violated a position of public and private trust, that he was the leader in the commission of a crime involving two or more criminal actors, that the offense involved more than one victim, and that the offense was committed to gratify Defendant's desire for pleasure or excitement.

The trial court found the above enhancement factors to apply, but acknowledged , "I cannot – I think I cannot, under the law, apply any of them except for No. 1 based upon the fact that this was prior to June 7th, 2005." The court then stated,

> You can have criminal behavior, and then you can have criminal behavior. The criminal behavior I see that he committed besides what he committed against [D.F.] was atrocious. I mean, you can have disorderly conducts; you can have some, I don't know, simple possessions of marihuana; but the things that he did that night and the things that he did to that young girl [S.T.] months before, those aren't your ordinary crimes. Those aren't ordinary criminal behavior. That's behavior that warrants the greatest amount of disdain and, you know, as I said at trial, words can't describe how awful this is. I suggest that the Court of Criminal Appeals, when they look at this, watch that video, and ask themselves what would be a – what would be a sentence that would be comparable to what he did that night and what he did with the young girl earlier that year. And I would think that they would say that he would be justified in every second that we could possibly give him under the law.

> So, based upon my finding of what happened that night and the criminal activity that he was not convicted for that night and the previous nights; and, of course, his previous history that was already mentioned in the presentence report. . . .

> I only wish he were not Range I because I think he deserves more time. . . . But I don't see anything, under the law, that would justify less than twelve years in this, in my opinion. I just wish I could sentence him to more. So, twelve years at thirty percent.

Under the pre-2005 statutory sentencing scheme, the trial court is required to begin with a presumptive sentence, which for a Class B or C felony is the minimum sentence in the sentencing range. The trial court must then adjust the sentence within the range as appropriate based upon the presence or absence of mitigating and enhancement factors set out in sections 40-35-113 and 40-35-114. Tenn. Code Ann. § 40-35-210(c)-(e). As a Range I, standard offender, Defendant is subject to a sentence of between eight and twelve years for his Class B felony conviction. *Id*. § 40-35-112(a)(2).

In *Blakely*, the Supreme Court held that " '[o]ther than the fact of a prior *conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely*, 542 U.S. at 301, 124 S. Ct. at 2536 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)) (emphasis added). The "statutory maximum" to which a trial court may sentence a defendant is not the maximum sentence after application of appropriate enhancement factors, but rather, other than the fact of a prior conviction, the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id*. at 303, 124 S. Ct. at 2537 (emphasis omitted). Under *Blakely*, then, the "statutory maximum" sentence which may be imposed is the presumptive sentence applicable to the offense. *See id*., 124 S. Ct. at 2537. The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant.

Although Defendant failed to raise the *Blakely* issue in this appeal, we elect to review Defendant's sentence for plain error. *See State v. Gomez*, 239 S.W.3d 733, 737-43 (Tenn. 2007) (our supreme court found that the defendants in that case were entitled to plain error review where their enhanced sentences were the product of a violation of the *Blakely/Gomez* holdings, and review via plain error was necessary to do substantial justice.). The presentence report admitted as an exhibit at the sentencing hearing reveals that Defendant has a prior history of criminal convictions. Therefore, we conclude that Defendant's sentence could be increased above the presumptive sentence under *Blakely*. The trial court's comments, however, at the sentencing hearing clearly indicate that the trial court relied upon other considerations not authorized under *Blakely*. Specifically, the trial court relied heavily upon a finding of criminal behavior by Defendant for conduct that did not result in a

*conviction*. Therefore, the trial court's imposition of the maximum sentence within the applicable range was error. We reduce the sentence to ten years.

Based on the foregoing, we affirm in part and reverse in part. We conclude that Defendant's sentence was improperly enhanced by applying enhancement factors not determined by a jury in violation of *Blakely*; therefore, Defendant's sentence of twelve years is modified to ten years. We remand this case for entry of an amended judgment consistent with this opinion.

_____
THOMAS T. WOODALL, JUDGE