# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

March 12, 2024 Session

## STATE OF TENNESSEE v. GREGORY TYRONE DOTSON

### Appeal from the Criminal Court for Davidson County
Nos. 2022-I-45, 2020-C-1470     Angelita Blackshear Dalton, Judge

_____

### No. M2023-00430-CCA-R3-CD
_____

This is an appeal from the order of the trial court revoking a community corrections sentence. On February 18, 2022, the Appellant, Gregory Tyrone Dotson, entered a guilty plea to aggravated assault with a deadly weapon, vandalism, and possession with intent to sell .5 grams or more of a substance containing cocaine, for which he received an effective sentence of ten years to be served on community corrections. Following an evidentiary hearing, the trial court revoked the Appellant's community corrections sentence based on the preliminary hearing testimony of Able Aguilar, the victim of the aggravated robbery as alleged in the violation warrant, and imposed the original ten-year sentence in confinement. On appeal, the Appellant contends the admission of Aguilar's preliminary hearing testimony violated his confrontation rights because there was an insufficient showing of good cause or reliability. He additionally argues the trial court erred in considering an offense that was not included in the violation warrant to revoke the Appellant's community corrections sentence and in ordering complete confinement. After review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Susan L. Kay, Nashville, Tennessee, for the appellant, Gregory Tyrone Dotson.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Glenn Funk, District Attorney General; and Matt Thomas, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

**Procedural History**.  After being placed on community corrections in February of 2022, several affidavits and arrest warrants alleging the Appellant had violated the terms and conditions of community corrections were filed.  On April 1, 2022, an affidavit and arrest warrant were issued alleging the Appellant had violated the terms and conditions of community corrections by testing positive for cocaine use.  On April 22, 2022, the Appellant conceded the allegation, and the trial court reinstated the community corrections sentence with an additional modification that a drug treatment facility assess the Appellant.  On July 12, 2022, a second affidavit and arrest warrant were issued, alleging the Appellant violated the terms and conditions of his community corrections based on a new arrest for domestic assault.  The second affidavit was later amended to include a violation based on alcohol use.  On August 4, 2022, upon consideration by the trial court, the second affidavit was dismissed, and the Appellant was ordered to remain on community corrections.  On September 14, 2022, a third affidavit and arrest warrant were issued, alleging the Appellant violated community corrections based on a September 6, 2022 violation of an order of protection.[1]  The third affidavit was amended on September 16, 2022, and additionally alleged that the Appellant violated community corrections based on a September 15, 2022 arrest for aggravated assault with a dangerous weapon (GS-978543), two counts of aggravated robbery (weapon or object) (GS-978544,-45), and possession of a firearm with intent to commit a dangerous felony (GS-978546).  The third amended affidavit gives rise to the issues presented in this appeal.

**Violation Hearing**.  On February 9, 2023, the trial court held an evidentiary hearing concerning the third amended affidavit alleging the Appellant violated community corrections.  At the top of the hearing, the court acknowledged the State had pre-filed a tape recording of the preliminary hearing testimony of Able Aguilar, the victim of the aggravated robbery in the community corrections violation affidavit and arrest warrant.  The court marked it as an exhibit to the hearing.  In response, defense counsel asked if the State planned to offer any evidence other than the preliminary hearing recording, and the State said it was not.  Based on State v. Wiley, defense counsel objected and argued that "just introducing the preliminary hearing testimony . . . could potentially violate [the Appellant's] confrontation right."  No. E2004-01463-CCA-R3-CD, 2005 WL 1130222, at *3 (Tenn. Crim. App. May 13, 2005), no perm. app. filed.  After much discussion, the trial court continued the hearing to allow the State to subpoena their witness or establish good cause for his absence.

On February 21, 2023, the trial court resumed the hearing and noted that it would no longer permit the local practice of allowing the parties to admit recordings of

---

[1] The record reflects the State did not proceed with the violation of the order of protection.

preliminary hearing testimony as a substitute for a witness's in-person testimony in revocation proceedings for convenience. Based on its research, the court determined that such recordings were admissible only upon a finding of a witness's unavailability or other good cause for the witness's absence. The evidence at the instant revocation hearing then commenced and consisted of five witnesses: Randy Martin, Able Aguilar (preliminary hearing recording), Detective Williams Burnett, Rita Dunbar, and Mary Ella Sullevic.

Randy Martin, an investigator with the Office of the Davidson County District Attorney, testified that he attempted to locate both victims of the aggravated robbery listed in the third amended affidavit, Able Aguilar and Jose Osuna, but he was unsuccessful. Regarding Aguilar, Investigator Martin "could not locate one piece of evidence or information on him whatsoever." The assistant district attorney had previously given Investigator Martin "2700 Smith Springs," the location of the aggravated robbery, to investigate. However, "even running [Aguilar's] name and that address nothing came up and . . . [the two women living there] . . . didn't know [Aguilar]."

On cross-examination, Investigator Martin agreed that he could not locate a phone number associated with Aguilar. While several names were listed under that same name, none were associated with the 2700 Smith Springs address. Investigator Martin was uncertain if 2700 Smith Springs was the last known address for Aguilar, but he agreed that Aguilar had received mail there at one time. Investigator Martin did not know how Aguilar was contacted to appear at the Appellant's December 15, 2022 preliminary hearing or how Aguilar was contacted to appear for a "2022 hearing for his own charges." Investigator Martin acknowledged that he did not check with a bail bonding company for Aguilar's home address. While Investigator Martin could not recall the specific date the District Attorney's office first contacted him to locate Aguilar, it was "after February 2nd or 3rd and before [February] 17th[.]" Investigator Martin acknowledged that he did not run any searches under "Abner Nolasco[,]" a second name used by Aguilar.

Based upon State v. Ladd and the cases cited therein, the trial court determined the State had established good cause for denying the Appellant's due process confrontation rights. No. M2011-02537-CCA-R3-CD, 2012 WL 4329255 (Tenn. Crim. App. Sept. 21, 2012), no perm. app. filed (discussing "good cause" requirement and finding error in the admission of preliminary hearing transcript harmless where defendant introduced it). The testimony of Able Aguilar from the preliminary hearing for general sessions case numbers 978543-46 was admitted into evidence as an exhibit.[2]

---

[2] The record shows the trial court received a recording of the preliminary hearing testimony of Aguilar in the form of a compact disc, which enabled the court to listen to Aguilar's voice during questioning. This exhibit as well as a transcript of the recording are included in the record on appeal.

During the December 15, 2022 preliminary hearing, Aguilar identified the Appellant as one of two individuals who took money and other items from him at gunpoint on August 12, 2022. At the time of the offense, Aguilar had been renting a room at the home of Jose Osuna, the other victim, located at 2700 Old Smith Springs Road for approximately fifteen days. Aguilar testified that on the day of the offense, he was outside in his driveway loading items in his truck, along with his girlfriend and another individual. An SUV pulled into the driveway with the Appellant and another individual inside.

Aguilar explained that the Appellant got out of the SUV and initially went to the back of the house. Aguilar said when the Appellant returned to the driveway area the following events occurred:

> [The Appellant] was like hey man, come here come here, and I was like, what's up you know, and whenever I came close to him I saw that he's got a gun with him and he put his right hand on my left pocket here and he's like I need your money because your [] friend doesn't want to pay me . . . .

Aguilar testified that he did not know the Appellant or what he was talking about. The men left the driveway area and entered the front part of the house where all the "roommates," including "Mr. Osuna, Juan, Ida, and Victor," were located. Aguilar stated the Appellant then took $700, his debit card, a key to his truck, and his cell phone from him under the following circumstances:

> Okay. So whenever they, the car was backing up again, you know, he come walk again and he was like pointing the gun like this to everyone . . . he came to me first and he was like I don't like you man. . . . And then he was like that's your girlfriend . . . and he's like I'm going to kill her, that is what he said. And, I was like, well, you have to go through me first and then I stepped in front of him and he had the gun right in front of me like this and he hit me on the chest with the gun and then he shoot into the air like that, you know, he did shoot it because Juan was coming right behind him . . .

The Appellant then "grabbed [Osuna] around the neck" and pointed the gun at him as the Appellant led him into the back of the house. Aguilar followed and watched the Appellant take Osuna into his bedroom. The Appellant began pulling items from the closet as he asked, "Where is all the money[?]" Aguilar observed the Appellant take cash from Osuna's wallet. The Appellant and the other man eventually left the residence with the second man driving Aguilar's truck. Aguilar said that sometime later, Detective Burnett showed him a photo lineup comprised of six pictures from which Aguilar identified the Appellant.

- 4 -

On cross-examination, Aguilar agreed that he had seen the Appellant and the second man once before in the same vehicle three days before the robbery incident. Aguilar admitted he only saw the Appellant exit the red SUV, walk to the back of the house, then return to his vehicle. The Appellant did not speak to Aguilar nor did Aguilar know who the Appellant visited in the back of the house. Aguilar stated the Appellant could have been visiting someone who lived in an apartment complex located behind the house. Aguilar insisted that he did not know the Appellant and had no previous interactions with him on the phone or CashApp. When asked why he never told law enforcement that he had seen the men at the residence before the day of the alleged robbery, Aguilar explained that he had not been asked that question.

Aguilar confirmed that he also went by the name "Abner Nolasco[,]" and that "anyone can know [his] name." Aguilar also confirmed that he owned a CashApp account under that name. He stated he "use[d] [his] CashApp with almost 1,000 people in Nashville," so he could not answer whether the Appellant had ever made a payment to his CashApp. He denied ever interacting with the Appellant on CashApp, but then added that "as far as [he] kn[e]w, [he] [didn't] think so."

Detective Burnett with the Metro Nashville Police Department investigated the August 12, 2022 aggravated robbery underlying the instant violation of community corrections. Detective Burnett testified that on the night of the aggravated robbery, the victims identified the Appellant "as a suspect that had fired a shot during the course of the robbery near the head of Mr. Aguilar, that shell casing was recovered, [and] approximately two weeks later . . . [the Appellant] was involved in a homicide at Lucky's Bar on Stewarts Ferry Pike." During the investigation of the homicide at the bar, the Appellant "turned a weapon over to homicide detectives that he identified as his weapon that was used in that homicide." The Appellant also admitted to the homicide detective that he had fired his gun in self-defense. However, the shell casing recovered from the August 12, 2022 aggravated robbery was a ballistic match to the gun retrieved from the Appellant in the homicide at the bar.

On cross-examination, Detective Burnett confirmed that he was not the responding officer to the underlying aggravated robbery and that a patrol officer had retrieved the shell casings. He agreed that he did not have the ballistics report with him, that he did not conduct the ballistics tests, and that he was not a ballistics expert. Detective Burnett initially stated that he "administered the double-blind [lineup] to both victims." However, he later clarified that he was not the officer who conducted the lineup. He explained, "I created the [lineup]. It was given to a West Detective, obviously to make it a double blind." He confirmed that he was present in the building and spoke with both victims after the photo lineup.

Rita Dunbar, the Appellant's godmother, met the Appellant through her daughter, who was the Appellant's best friend. The Appellant lived with Dunbar in her home for approximately "six or seven months" before his incarceration. Dunbar described the Appellant as respectful, a clean housemate, and helpful around the house. She trusted the Appellant with her daughters when she was not present in the home. Dunbar testified that she would allow the Appellant to live with her again if he was released. On cross-examination, she acknowledged that the Appellant did not consistently sleep in the house every night and that she did not know where he was when he was gone overnight.

Mary Ella Sullevic, a community corrections case manager, testified that she was familiar with the Appellant's file and had interacted personally with the Appellant. She said the Appellant communicated regularly with the office, was cooperative, respectful, and always attended required meetings. Sullevic had no opposition to the Appellant remaining on community corrections.

The parties closed the proof, and the trial court took the matter under advisement until the next day. On February 22, 2023, the trial court revoked the Appellant's community corrections sentence and imposed the original sentence of ten years of confinement based on the following oral findings:

> So[,] as I stated earlier the [c]ourt has considered the preliminary hearing testimony of Mr. Aguilar, as well as the testimony, for purposes of determining whether the [c]ourt finds by a preponderance of the evidence that [the Appellant] violated conditions of his community corrections, the [c]ourt also considered Detective Burnett's testimony.
>
> While it [is] very circumstantial, and remember the burden is preponderance of the evidence, while very circumstantial the [c]ourt finds that the proof preponderates that [the Appellant] did in fact violate the conditions of his . . . community corrections based upon his conduct on August 12, 2022.
>
> Again, the [c]ourt recognizes that it is very circumstantial. Well, I guess if the [c]ourt takes Mr. Aguilar's testimony, it would be direct, because Mr. Aguilar testified by his own observation, but let's for argument say that there is an issue as to Mr. Aguilar's credibility, again, circumstantial evidence places [the Appellant] at the scene by way of the shell casing that was found at the scene that matched the gun that [the Appellant] gave to police who were investigating a non-related shooting, based upon all of that the [c]ourt . . . finds that by a preponderance of the evidence that [the Appellant] has in fact violated the conditions of his community corrections.

So now, the next step is what does the [c]ourt do?  The [c]ourt appreciates Ms. Dunbar's testimony with regards to providing [the Appellant] with a place to live if released from custody.  The [c]ourt, however, is concerned [] that this is not [the Appellant's] first violation since being placed on community corrections and even in taking that into even greater consideration the [c]ourt is extremely concerned with the allegation of [the Appellant] . . . allegedly possessing a firearm.

. . . [N]otwithstanding his conviction offenses prior to this case, because he does in fact have a pretty substantial criminal record . . . his criminal convictions from this case most definitely prohibited [the Appellant] from possessing a firearm.  That is a great concern to the [c]ourt that it is alleged that he was involved in a shooting or the possession of a firearm and the discharge of a firearm on August 12, 2022.

The [c]ourt acknowledges that the alleged homicide was not an allegation contained in the violation, but it just compounds the [c]ourt's concern.  Considering that, the [c]ourt . . . finds it appropriate to place [the Appellant's] sentence into effect and that is the order of the [c]ourt.  All right.

The Appellant filed a timely notice of appeal, and this case is properly before this court for review.

## ANALYSIS

**I.  Unavailability of Witness**.  The Appellant contends the trial court erred in admitting the preliminary hearing testimony of Able Aguilar because the State failed to establish good cause for his absence and because the preliminary hearing testimony was unreliable.  Although the State ran Aguilar's name through a database and visited his last known residence, the Appellant argues the State should have also searched the second name used by Aguilar, contacted his bonding company for information, or located people familiar with Aguilar to find him.  The Appellant argues the State should have been more diligent in monitoring Aguilar between the preliminary hearing two months before the revocation hearing and the hearing on Aguilar's own matter.  In response, the State contends, and we agree, that the trial court properly admitted the preliminary hearing testimony of Aguilar after the State had established good cause for not allowing in-person confrontation.

The confrontation clause of the United States and Tennessee constitutions provides defendants the right to confront adverse witnesses "[i]n criminal prosecutions."  U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  Revocations of probation are not part of a

criminal prosecution, and thus, the full panoply of rights due a defendant in such a proceeding does not apply to probation revocations. Morrissey v. Brewer, 408 U.S. 471, 480 (1972) ("there is no thought to equate . . . [a] parole revocation to a criminal prosecution in any sense"); Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973) ("Probation revocation, like parole revocation, is not a stage of a criminal prosecution . . . ."); see also State v. Harkins, 811 S.W.2d 79, 83 (Tenn. 1991) (noting "the similar nature of a community corrections sentence and a sentence of probation" and holding "the same principles are applicable in deciding whether a community corrections sentence revocation was proper"). Although the revocation of probation is not a part of the criminal prosecution, the loss of liberty entailed is a serious deprivation that requires the probationer to be accorded due process. Gagnon, 411 U.S. at 781. The minimum requirements of due process include:

> (a) written notice of the claimed violations of (probation or) parole; (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

Id. at 786 (citing Morrissey, 408 U.S. at 488-89). Accordingly, under due process principles, a probationer is entitled to confront and cross-examine adverse witnesses unless the hearing officer specifically finds good cause for not allowing confrontation. Black v. Romano, 471 U.S. 606, 612 (1985); State v. Wade, 863 S.W.2d 406, 407 (Tenn. 1993) (because "the issue in a probation revocation proceeding is not the guilt or innocence of the defendant, the right to confront and cross-examine adverse witnesses is not absolute and may be relaxed under certain circumstances").

Hearsay evidence is admissible at a probation revocation hearing so long as the confrontation requirements under Morrissey are met. Wade, 863 S.W.2d at 409. These include (1) a specific finding by the trial court of "good cause" that would justify the denial of the defendant's right to confront and cross-examine an adverse witness; and (2) a showing that the information contained in the report is reliable. Id. This two-prong test requires that the fact-finder first assess "why confrontation is not desirable or impractical," and second to determine "whether the hearsay evidence sought to be admitted bears substantial indicia of reliability." Moss v. Tenn. Bd. of Paroles, No. M2000-00128-COA-R3-CV, 2000 WL 1425278, at *2 (Tenn. Ct. App. Sept. 28, 2000), no perm. app. filed. Good cause is not a precise standard, and there is no bright-line rule for determining

whether good cause exists. Miller v. Tenn. Bd. of Paroles, No. 01A01-9806-CH-00293, 1999 WL 43263, at *5 (Tenn. Ct. App. Feb. 1, 1999), no perm. app. filed. The inquiry is factually driven and may, in large measure, depend on the nature and purpose of the evidence sought to be introduced. Id. While testimony concerning a person's desire to express an opinion on the character of a probationer need not be subjected to confrontation or cross-examination, testimony establishing the grounds for revoking a probationer should be treated "more rigorously because it provides the basis for depriving the [probationer] of his or her liberty." Id. A court making such determinations should ensure that the evidence sought to be introduced is "inherently reliable" or that it has been "subjected to the same sort of adversarial questioning as live, in-person testimony." Id. at *6.

As an initial matter, the Appellant relies in large part on State v. Sharp, 327 S.W.3d 704 (Tenn. Crim. App. 2010) and State v. Jackson, No. M2020-01098-CCA-R3-CD, 2022 WL 1836930, at *16 (Tenn. Crim. App. June 3, 2022), for the proposition that the State failed to establish sufficient good cause to dispense with the in-person testimony of Aguilar. However, in these cases, the question at issue was whether the admission of hearsay evidence at a criminal prosecution violated the defendant's Sixth Amendment right to confront witnesses based upon the State's failure to establish a good cause. As previously discussed, the right to confront adverse witnesses in a revocation hearing arises not under the Sixth Amendment confrontation clause, but rather as a matter of due process, which is less stringent than the confrontation guarantee in a criminal trial. Accordingly, we conclude the above cases are distinguishable and do not apply.

In any case, the record reflects the trial court considered the testimony of Investigator Martin at the violation hearing for the purpose of determining whether the State had established good cause for dispensing with Aguilar's in-person testimony. Investigator Martin attempted to locate Able Aguilar, the victim of the aggravated robbery listed in the third amended affidavit, but he was unsuccessful. Investigator Martin "could not locate one piece of evidence or information on [Aguilar] whatsoever." When Investigator Martin went to "2700 Smith Springs," the location of the aggravated robbery, the two women there did not know Aguilar and were unable to provide Investigator Martin with any information as to the whereabouts of Aguilar. Investigator Martin also input Aguilar's name in a database but "nothing came up" associated with the 2700 Smith Springs address. Aguilar, nonetheless, could not be located. Based on this evidence, the trial court concluded, and we agree, that the State had shown good cause to dispense with Aguilar's in-person testimony at the revocation hearing.

Even where there is a showing of good cause, due process also requires a showing of reliability. Wade, 863 S.W.2d at 408. The Appellant does not contest the procedure or method used by the State to obtain the challenged evidence. Rather, the Appellant challenges various inconsistencies within Aguilar's preliminary hearing testimony as proof

of its unreliability. He also argues that, in contrast to the testimony of Detective Burnett, Aguilar testified the photo lineup administered for the aggravated robbery was conducted by Detective Burnett. In resolving this issue, we acknowledge that the trial court did not make an explicit finding of reliability. However, the trial court listened to the recording of Aguilar's preliminary hearing testimony and was therefore able to audibly observe the witness to determine his credibility. In doing so, the trial court resolved any inconsistencies within Aguilar's testimony against the Appellant. Finally, even though it was not the sole basis of the revocation, the trial court noted Aguilar's testimony was corroborated by the ballistics report which provided independent evidence of the Appellant's presence at the scene of the aggravated robbery. Accordingly, the trial court did not err by admitting Aguilar's preliminary hearing testimony and the Appellant is not entitled to relief.

**II.** **Probation Revocation**. The Appellant asserts the trial court abused its discretion in revoking community corrections and imposing his original sentence. He specifically argues the trial court improperly considered the homicide at the bar. In response, the State contends, and we agree, that the trial court properly revoked community corrections and imposed the Appellant's original sentence.

Appellate courts review a trial court's revocation of a defendant's probationary sentence under an abuse of discretion standard with a presumption of reasonableness, "so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." State v. Dagnan, 641 S.W.3d 751, 759 (Tenn. 2022). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). After finding by a preponderance of the evidence that a defendant violated the terms of their probation, a trial court "must determine (1) whether to revoke probation, and (2) the appropriate consequence to impose upon revocation." Dagnan, 641 S.W.3d at 753. The trial court has discretionary authority to revoke the defendant's probation if the defendant has violated his probation by committing a new felony, new Class A misdemeanor, zero tolerance violation as defined by the department of correction community supervision sanction matrix, absconding, or contacting the defendant's victim in violation of a condition of probation. Tenn. Code Ann. § 40-35-311(e)(2); Dagnan, 641 S.W.3d at 756.

Based on our review of the record, we conclude that the trial court did not abuse its discretion in finding that the Appellant violated the conditions of his community corrections sentence and imposing his original ten-year sentence of confinement. The trial court determined that the Appellant had violated his community corrections sentence based on the testimony of Aguilar. Aguilar identified the Appellant as the individual who approached him at his home on August 12, 2022, brandished a gun at multiple individuals,

struck Aguilar, and stole his money, a debit card, keys to his truck, and his cell phone. We acknowledge the Appellant makes many arguments in his brief concerning the propriety of Aguilar's testimony; however, as noted by the trial court, the burden of proof to sustain a violation of community corrections is by the preponderance of the evidence, which was met in this case. The consequence imposed for the Appellant violating community corrections was also proper. Here, the trial court imposed the Appellant's original ten-year sentence of confinement noting that the Appellant had previously violated his community corrections probation and the fact that the instant violation involved possession and use of a firearm by a convicted felon. After noting these concerns, the trial court acknowledged "that the alleged homicide was not an allegation contained in the violation, but it just compounds the [c]ourt's concern." Based on this comment, the Appellant argues the trial court considered "erroneously admitted" and "prejudicial" evidence. We disagree. See, e.g., State v. Fleming, No. E2017-02352-CCA-R3-CD, 2018 WL 6787580, at *3-4 (Tenn. Crim. App. Dec. 26, 2018), no perm. app. filed (holding that the trial court did not err considering evidence of actions not alleged in the violation report because the trial court did not use the evidence to determine that the defendant violated his probation). In our view, the trial court's comments did not form the basis of the revocation and were, therefore, not improper. The Appellant was given the benefit of an alternative sentence yet failed to comply with its terms. We conclude that the trial court acted well within its authority in revoking the Appellant's community corrections sentence and imposing confinement. Accordingly, the Appellant is not entitled to relief.

On May 23, 2024, after briefing and oral argument in this case, the Appellant, acting pro se, filed a document seeking to notify this court that he was ultimately not charged with the alleged homicide at the bar. However, the Appellant is represented by counsel and his pro se filing is therefore denied. See State v. Davis, 141 S.W.3d 600, 615 n.12 (Tenn. 2004) (noting that a defendant in a criminal case may not proceed pro se while simultaneously being represented by counsel).

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE